## PRINTING HOUSE v. TRUSTEES.

1. A corporation was created in one State to promote a benevolent enterprise, and its charter provided that the presidents of institutions organized in other States of the Union to collect funds to aid it should constitute a board of visitors, with absolute supervisory control over its affairs. In another State such an institution was formed. The trustees thereof reserved the right, in conjunction with the presidents of other similar boards, to supervise and administer the affairs of the original corporation in accordance with its charter, and collected a fund to be applied in aid of it. A fundamental change was subsequently made in the charter. whereby the visitorial rights of the auxiliary institutions were materially changed. The contributors to the fund demanded a return of it, upon the ground that the conditions upon which it had been advanced were not performed, and the corporation brought suit against the institution to recover it. *Held*, that the suit could not be maintained.
2. Section 9 of the amended charter of the corporation (*infra*, p. 721) changed essentially the constitution and powers of the board of visitors, as created and defined by sect. 10 of the original charter (*infra*, p. 717).
3. The general doctrine relating to charities, and to the jurisdiction of a Court of Chancery over them, has no application to this case.

APPEAL from the Circuit Court of the United States for the District of Louisiana.

The facts are stated in the opinion of the court.

*Mr. J. D. Rouse* and *Mr. William Grant* for the appellant.

*Mr. Edwin T. Merrick, Mr. George W. Race*, and *Mr. John A. Campbell* for the appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case was instituted in May, 1876, by a bill in equity filed by the American Printing House for the Blind, a Kentucky corporation, against the Louisiana Board of Trustees of the American Printing House for the Blind, a Louisiana corporation, praying for an account and payment of moneys alleged to be in the hands of the defendant, which had been raised by contributions for the benefit of the complainant. An amended bill was filed in December, 1876, adding as defendants Henry B. Foley, Valsin J. Dupuy, Nathaniel Cropper, of Louisiana, who, claiming to be original contributors to the fund in question, had sued the defendant corporation for a return of their several contributions; also, Magruder and Richardson, a law

firm, who represented other contributors making the like claim; also, the Attorney-General of the State of Louisiana, which had contributed to the same fund, and had brought suit to recover its contribution; also, finally, the American Printing House for the Blind and the American University for the Blind, a corporation of the District of Columbia, which made some claim to the fund.

The claim of the original and amended bills was based upon an allegation to the effect that in the year 1858 the complainant received a charter from the State of Kentucky to enable it to raise and collect funds for establishing at Louisville, Ky., a publishing house for printing and publishing books in raised letters for the use of the blind in the United States; that said charter contemplated, and was granted in expectation of aid and co-operation from other States, particularly Tennessee, Mississippi, and Louisiana; that the original defendant was chartered by the legislature of Louisiana in 1859 for the express purpose of collecting funds to aid the Kentucky corporation to carry out its benevolent enterprise; and that the funds in question had been collected and were held for that purpose, and no other, and ought in equity to be paid over to the complainant, who, it was alleged, had complied with all the conditions required to entitle it to the money.

The Louisiana board filed an answer, in which the principal point of defence set up was, that, although the moneys in question had indeed been collected for the purpose indicated by the bill, yet that after their collection, and in the year 1861, the Kentucky corporation obtained a new charter materially different from the original one, and subversive of the rights which the Louisiana board were to enjoy in the administration of the scheme, and which were expressly named in their own (Louisiana) charter as a condition of entering into said scheme and contributing to it. They also set up the delay of fifteen or sixteen years in making any demand for the fund as a fatal objection to any such demand being sustained now. The rights referred to as having been abrogated by the new charter are specially set forth in the answer; being the right of visitation, supervision, and control over the affairs and management of the central institution at Louisville, to be exercised by the presi-

dents of the several State boards of trustees contributing to the general scheme, who were to constitute a board of visitors, with the right to visit the printing house, examine the books, and investigate the proceedings of the trustees, and of discharging them and vacating their offices and appointing new trustees in case of finding them guilty of mismanagement, malfeasance in office, or neglect of duty. The answer alleges that all this was abrogated by the new charter of 1861, and the right of visitation, instead of being left to the presidents of the State boards of trustees, was given to governors of States of North America contributing the smallest aid in sustaining the printing house, and superintendents of institutions devoted exclusively to the education of the blind, and State auxiliary boards. The answer also contended that the new charter created a new and different corporation by the substitution of new names of corporators in place of those contained in the original charter.

The allegations of the answer, in point of fact, are clearly proven; but the complainant contends that, in point of law, no such change was made in the new charter as to exonerate the defendants from the duty of paying over the funds collected by them; and that the defendants, in their litigation with the original contributors, acknowledged the rights of the complainant, and are estopped from denying them.

The other defendants filed answers and cross-bills, in which they contend that the complainant failed to perform the conditions on which the money was contributed, — as, that the sum of $25,000 should be raised within seven years, and that a permanent printing establishment should be erected and in operation within nine years, from the date of the charter; and they claimed to have their several contributions restored to them with interest.

This is a general description of the litigation. Considerable evidence was taken, much of it being directed to the supposed admissions of the Louisiana board as to the right of the complainant to the money. On final hearing the court below dismissed the bill. The complainant appealed from that decree.

In order to a proper understanding of the controversy, it will be necessary to examine somewhat more minutely the

charters of the respective parties, and the acts and proceedings which led to their formation, and to the collection of the fund sought to be recovered.

The scheme for establishing a general printing house for printing books for the blind of the United States, which led to the organizations referred to, originated in Mississippi as early as 1857, if not earlier. A Mr. Dempsey B. Sherrod took much interest in the subject, and visited several of the Southwestern States, for the purpose of getting up organizations and collecting funds. His operations were commenced in Mississippi, and extended thence to Kentucky, Tennessee, Louisiana, and other States. In December, 1859, he was appointed by the Kentucky board agent to organize auxiliaries in Missouri, Illinois, Indiana, and Ohio; and acted as such during the year 1860. But he had previously been appointed agent for the Mississippi board, which was the first organized, and afterwards by the Louisiana board. The Mississippi board was chartered Nov. 14, 1857. The preamble of the charter recites as follows: " Whereas it is contemplated to establish at Louisville, Kentucky, a publishing house to print books in raised letters for the use of the blind in the United States; and whereas, to establish said publishing house upon a permanent basis, and with a sufficient capital, contributions from various States of the Union will be necessary; to effect which object acts of incorporation like this will be applied for in other States, the object of which incorporation will be to aid in collecting and effectually securing for such object the money which may be contributed in each State:" therefore it was declared (sect. 1), that the Hon. C. P. Smith, Hon. William L. Sharkey, and three others named, and their successors, &c., should be a body corporate under the name of the " Board of Trustees to aid in establishing a publishing house to print books, &c., for the benefit of the blind," with power to use a common seal, and to make such contracts as might be necessary to effect the objects of their corporation. By sect. 3, Dempsey Sherrod was appointed general agent of said board to solicit subscriptions and contributions for the above purpose in this and other States of the Union, and to apply to other States for similar acts of incorporation. Upon his

death or resignation the board should have power to appoint another. By sect. 6, the board of trustees were authorized to receive contributions in money, &c., for the purpose aforesaid, and, until $25,000 should be raised in this and other States, were to invest the same at interest. By sect. 7, if the sum named should not be raised within seven years, and the publishing house should not be established within nine years, the contributions should be returned to the contributors with interest. By sect. 8, it was declared that, so soon as the legislature of Kentucky should pass an act incorporating trustees for establishing said publishing house in Louisville, and this board had evidence that $25,000 were raised, the fund in the hands of this board should be transferred to the board of trustees incorporated by the State of Kentucky, in such sums as might be needed to carry on the business; provided, if Kentucky should not pass such a law incorporating said board, the Mississippi board might select some other place for publication in such State as might pass such act.

At the same time the legislature of Mississippi passed an act, by which, after reciting that $12,000 had been subscribed by private individuals, they appropriated $2,000 to the board of trustees in aid of the object.

It may be remarked here that only about $1,000 of the money raised in Mississippi were ever paid to the Kentucky institution. What was the cause of this does not clearly appear. From the evidence of Mr. Bullock, the president of the complainant, it appears that the Kentucky board became dissatisfied with Sherrod after 1860, and he was no longer employed as their agent. Mr. Foster, a witness for the defendant corporation, and one of its trustees from its organization, testifies that after the war they learned from Mr. Sherrod that the trustees at Louisville had changed their charter, making material changes which affected the whole institution, and he, Mr. Sherrod, had withdrawn entirely his connection from it; so had the parent society, organized in Mississippi, and he had established another institution called the American Publishing House and American University for the Blind, in the District of Columbia. It may be that this explains the discontinuance of co-operation on the part of the Mississippi board.

Although a board of trustees was chartered in Tennessee, and an appropriation of $2,000 was made by the legislature of that State in 1858, and a law was passed making an annual appropriation of $10 for every blind person in the State, according to the census, which amounted in seven years to the sum of $38,780; yet, for some unexplained reason, no money was ever contributed from that State to the Kentucky institution, and in 1867 the law was repealed.

The first charter granted by Kentucky, and under which the complainant claims to have been organized, was an act of the legislature, passed Jan. 26, 1858. As this charter is important, because it was in force when that of the Louisiana board of trustees was adopted, and when the funds in question were mostly contributed, it will be proper to give the exact language of its most important provisions. It commenced with the following recital : —

" Whereas the State of Mississippi has by law made an appropriation of 2,000 dollars to aid in establishing in Kentucky a national institution to print and circulate books in raised letters for the blind ; and whereas said State has incorporated a board of trustees to receive said money, and 12,000 dollars which have been subscribed for the aforesaid purpose by citizens of Mississippi, and to transfer said fund to said institution in Kentucky ; and whereas it is anticipated that other States will make donations and incorporate trustees to aid in this enterprise."

It then enacted, —

" Sect. 1. That an institution under the name of the American Printing House for the Blind be established in Louisville, Kentucky, or its vicinity, and that James Guthrie, William F. Bullock, Theodore S. Bell, Bryce M. Patten, John Milton, H. T. Curd, and A. O. Brannin, and their successors, be, and they are hereby, declared a body corporate under the name and style of the Trustees of the American Printing House for the Blind, with the right as such to use a common seal, to sue and be sued, to plead and be impleaded, in all courts of justice and in all cases in which the interests of the institution are involved. The said trustees are hereby fully empowered to receive, by legacies, conveyances, or otherwise, lands, money, and other property, and the same to retain, use, and apply to the publishing of books in raised letters for the blind in the

United States. Said trustees are authorized to purchase land and erect, purchase, or rent buildings for the use of said institution, and to make all such contracts as may be necessary to accomplish the purposes of their incorporation. . . .

" SECT. 2. The trustees shall elect, annually, a president, a treasurer, and a secretary, who shall hold their offices until their successors shall be elected and duly qualified. Said trustees may prescribe the duties and fix the compensation of said officers. . .

" SECT. 6. It shall be the duty of the board of trustees, before commencing the publication of any book, to request the superintendent of every institution for the education of the blind in the United States to make out and send to the trustees of the printing house a list of such books as he may deem most desirable for the use of the blind; and said trustees shall select for publication the book that shall have received the greatest number of superintendents in its favor. This mode of selecting books for publication shall be repeated at least once every year.

" SECT. 7. Every school for the blind located in a State whose legislature or citizens contribute to the funds of the American Printing House shall, in proportion to the funds, be entitled to copies of every book published by said house, to be distributed gratuitously to such blind persons as are unable to purchase them. And the superintendents of said schools shall be required to report to the trustees of said house the names and residences of all persons to whom books may be thus distributed. The prices of books published by this institution shall be made so low as merely to cover the cost of publication and other incidental expenses of the institution.

" SECT. 8. It shall be the duty of the board of trustees to make an annual report of its proceedings, which shall embrace a full account of the receipts and disbursements, the funds on hand, the number of books sold, and the number distributed gratuitously, and a general statement of the condition of the institution; and they shall transmit copies of said reports to the General Assembly of Kentucky, to the governors of the several States of the Union, the president of each State board of trustees, to the superintendent of every institution of the blind in the United States, and to every person who shall have made to the institution a donation of more than five dollars the previous year.

" SECT. 10. The presidents of the State boards of trustees shall, *ex officio,* constitute a board of visitors, each member of which shall

at all. times be authorized to visit the printing house, examine the books, and investigate the proceedings of the trustees; and the president of the oldest State board. of trustees shall,. at the written request of a majority of the visitors, call a meeting of the board of visitors, who shall be fully empowered to investigate the proceedings of the trustees of the institution, and in case they shall find said board or any member thereof has mismanaged the affairs of said institution, by malfeasance in office or neglect of duty, they may, a majority of three-fourths .of all the members concurring, declare the office or offices of said trustee or trustees vacant, and proceed to fill such vacancy by election from the citizens of Louisville or its vicinity. Notice of all meetings of the board of visitors shall be sent by mail to all the presidents of the State boards and to all the trustees of the printing house at least one month before the time appointed for said meetings.

"SECT. 11. The trustees of said printing house shall continue in office until their offices shall become vacant by resignation,. death, or removal from office as hereinbefore provided for. All vacancies caused by resignation or death shall be filled by the remaining members of the board.

"SECT. 12. Be it further enacted,. that each donor shall be entitled to his donation, with the interest, after the deduction of the necessary expenses are paid, provided said publishing house is not established within nine years from the passage of this act; and should the board refuse to make said distribution among the donors according to their respective interests, then, and in that event, said donors may have the right to proceed to recover the same by legal proceedings instituted in any of the courts of this Commonwealth having jurisdiction thereof."

The provisions of the tenth section of this act are especially material in the determination of this cause. It was the change made therein by the subsequent act of 1861, as will hereafter appear, on which the defendants principally rely for refusing to pay over to the complainant the moneys in controversy. It will be seen that direct reference was made to it in the Louisiana charter. This charter was taken out under the general corporation law of the State of Louisiana, and is dated Jan. 3, 1859. It recites as follows: —

"Whereas, it is contemplated to establish at Louisville, in. the State of Kentucky, a publishing house, to print and publish books,

in raised letters for the use of the blind in the United States; and whereas, to establish said publishing house on a permanent basis, and with sufficient capital, contributions from various States of the Union are anticipated; and whereas, it is proper and just that a portion of said funds should be contributed by the citizens of the State of Louisiana, and believing the object to be worthy the consideration and liberality of a generous public, and desiring to cooperate in the accomplishment of the proposed enterprise, we, the undersigned citizens of Louisiana, do hereby associate ourselves together, and constitute ourselves and our successors a body corporate, under the provisions of an act of the legislature of the State of Louisiana, approved March 14, 1855, entitled ' An Act for the organization of corporations for literary, scientific, religious, and charitable purposes,' and we do hereby agree to the following article of corporation : —

" 1. The name and style of this corporation shall be ' The Louisiana Board of Trustees of the American Printing House for the Blind,' by which name it shall be known, and be capable to sue and be sued, and the domicile of this corporation shall be in the city of New Orleans.

" 2. The object of this association and corporation shall be to raise funds for, and otherwise to aid in, the permanent establishment and successful management at Louisville, Kentucky, of a publishing house for the printing and publication of books in raised letters for the use of the blind in the United States.

" 3. The trustees shall annually elect, by ballot, from their own number, a president, on whom all legal process shall be served, a treasurer and secretary, provided that said officers shall continue in office until their successors shall have been elected and qualified.

" 4. The trustees shall have power to fill all vacancies occurring in the board by death, resignation, or otherwise; to adopt by-laws for their own government, and prescribe the duties of its officers and members, and they shall be empowered to receive by donation, bequest, purchase, or otherwise, and to hold and use properties, real and personal, to the amount of one hundred thousand dollars.

" 5. The trustees shall hold the funds and properties of the corporation for the purposes thereof, and until the sum of twenty-five thousand dollars is raised in this State and other States of the Union, the same may be safely invested at the discretion of the trustees; that so soon as the trustees are officially informed by

the trustees of the American Printing House for the Blind, at Louisville, Kentucky, that the sum of twenty-five thousand dollars has been raised, they shall then remit the funds and properties received by them to said trustees at Louisville, in such sums as may from time to time be required to establish and carry on said publishing house; provided that should said sum of twenty-five thousand dollars not be raised within seven years from the date of this incorporation, or said publishing house not be established within nine years from said date, then the donations and contributions received, together with the interest thereon accrued, after deducting expenses of the incorporation, shall be returned to the contributors and donors thereof.

"6. The trustees reserve to themselves at all times the right, through their president, of visiting the establishment, or printing and publishing house, at Louisville, and inspecting the books and management of the same, and, in conjunction with the presidents of other boards that may be formed, the supervision and administration of the affairs thereof, in accordance with the provisions of the tenth section of the charter of 'The Trustees of the American Printing House for the Blind,' as incorporated by the General Assembly of the State of Kentucky."

From the sixth article, above quoted, it clearly appears that the Louisiana board regarded the provisions of the tenth section of the Kentucky charter as material and fundamental. It gave them, through their president, in conjunction with the other State boards, through their presidents, the ultimate control and management of the central institution; and they expressly reserve to themselves at all times this vital prerogative. It may be fairly presumed that without it they would never have engaged to pay over their contributions to the Kentucky board.

The question then is, whether this provision has been materially altered by the Kentucky legislature in the new or amended charter which was granted to the Kentucky board in April, 1861.

A glance at this amended charter is sufficient to decide the question. It is a recast of the whole incorporating act. After copying the preamble of the original charter, it proceeds to name the corporators, substituting two new names in place of two others in the original. Perhaps this is a change of but

little moment; though the defendants regard it as a change of
the corporation.  The general objects of the association and
duties of the trustees are substantially the same as those con-
tained in the original act.  It is observable, however, that in
referring to States that may become interested in the institu-
tion, and to institutions for the education of the blind which it
is anticipated will share in its benefits, the States of North
America are named instead of the States of the Union, or of
the United States; and institutions for the education of the
blind in North America, instead of institutions in the United
States, — evidently contemplating the possibility of a disinte-
gration of the United States, and the establishment of another
government in its territories.  But without further reference
to this noticeable change, we proceed to copy the ninth section,
which replaces the tenth of the original act.  It is in these
words : —

"The superintendents of State institutions devoted exclusively
to the education of the blind, and the governors of the States that
aid in sustaining the American Printing House for the Blind, and
the presidents of the State auxiliary boards of trustees, shall, *ex
officio*, constitute a board of visitors, each member of which shall
be at all times authorized to visit the printing house, examine the
books, and investigate the proceedings of the trustees; and the
president of any State board may, at the request of a majority of
the visitors, call a meeting of the board of visitors, who shall be
fully empowered to investigate the proceedings of the trustees of
the institution, and in case they shall find that said board, or any
member thereof, has mismanaged the affairs of the institution by
malfeasance in office or neglect of duty, they may, a majority of
three-fourths of all the members present concurring, declare the
offices or office of said trustees or trustee vacant, and proceed to fill
the vacancy, by election from the citizens of Louisville or its vicinity.
Representatives from a majority of the States that contribute to
the support of the American Printing House for the Blind shall
constitute a quorum of the board of visitors, and each State repre-
sented shall be allowed one vote in the action of the board.  Notice
of every meeting of the board of visitors shall be sent by mail to
all the members of the board, and to the trustees of the American
Printing House for the Blind, at least one month before the time
appointed for the meeting."

This is certainly a material change in the supervisory government and control of the institution.; indeed, it may be denominated a subversion of the original constitution. By the original charter, the State boards of trustees, through their presidents, were constituted the board of visitors, with absolute supervisory control, even to the extent of discharging from office the entire board of trustees of the central institution for mismanagement of its affairs, malfeasance in office, or neglect of duty. By the new charter, the presidents of the State boards have a seat in the board of visitors, it is true; but their power, which before was exclusive, is now in effect taken from them, and shared by the governors of all the States that aid in sustaining the institution, and the superintendents of all State institutions devoted exclusively to the education of the blind. In a matter so important as the government of the institution, such a change cannot be said to be immaterial, or anything less than fundamental. It is more especially important in this case because made the subject of an express reservation in the charter of the defendants.

In view of the facts above detailed, the question still remains, whether, after such a fundamental change in the constitution of the central organization, affecting so materially the rights of the auxiliary boards in regard to the control of the institution, they are bound to pay over to that institution the funds committed to their charge. If an individual should subscribe to a charitable scheme upon certain conditions as to its organization and control, and those conditions are violated before the payment of his subscription, it can hardly be doubted, that he would be discharged from his obligation to pay it. Whatever power the legislature may possess to modify the organization of an established charity in point of form, it cannot change an executory contract to contribute to such charity. The power to do this would, in effect, be a power to make a contract for a party which he is himself unwilling to make. The authorities which affirm the legislative power to modify the forms of public and charitable institutions, do not apply to such a case.

The position of the defendants is somewhat anomalous.

They are not themselves the original contributors; but they represent them. They are their trustees, as well as trustees for the benefit of the proposed foundation. The money of the contributors has been deposited in their hands to be applied to a proposed charity on certain conditions. The defendant board, as the representatives of the contributors, occupy a relation to the general foundation similar to that of a subscriber to its funds. They stand upon the terms of an agreement, or contract, by which, in effect, they engage, upon certain conditions, to contribute and pay over to the central institution the money intrusted to them. They cannot be considered as bound, in law, to pay it over at all events. They certainly would not be so bound if the character of the charity should be materially changed. It is difficult to see how they can be so bound if its constitution and government are so changed as to deprive the defendants of that participation in the control which it was stipulated they should have. If the original contributors were all willing to waive the objection, the case might be different; but the original contributors are claiming a return of their contributions; and if they were not doing this, it would nevertheless be difficult to ascertain their united will. The duty and only safe course of the defendant trustees is, to withhold the contributions in their hands if they see that there has been a clear violation of those conditions upon which such contributions were made. By their own constitution, they have certain distinct rights and duties, — rights which they not only may, but ought to, insist on; because they are not only theirs, but, representatively, those of their constituents, the donors of the fund. They are not part and parcel of the Kentucky institution; though they were to have had an important share in its control. They are a separate organization, existing under distinct laws. It is apparent from the evidence in the case that the several State contributions, and incorporations of trustees, whilst looking to a common and general foundation, or charity, for the benefit of the blind in the United States, had also special reference to the benefit of that class in the particular State. The legislative appropriations which were graduated by the number of blind in the State, which were made in most of the States interested, indicate this. The

provision of the Kentucky charter securing to schools for the
blind in a contributing State a gratuitous distribution of books
in proportion to the amount contributed, indicates the same
thing. Reciprocal benefits were evidently expected in con-
sideration of the amount of aid to be contributed. This is
shown by the entire testimony. Mr. Bullock, president of
the complainants, whilst complaining of the unwillingness of
the Louisiana board to pay over their fund, says: "From the
beneficial agencies of our institution the blind of Louisiana
have been almost entirely shut off through the unwillingness
of the Louisiana board to give up the money in their hands."
Again: "It is easy to see that if the Louisiana board gives
us the money raised for us, every dollar will be returned to
the blind of Louisiana in the shape of books and apparatus
for their education, undiminished by any tax for the expenses
incurred in starting our enterprise. The institution for the
education of the blind in Baton Rouge, La., is in need of
books, maps, slates, models, and educational appliances of all
kinds. The funds held by the Louisiana board should be sent
to us to supply these wants." The testimony of the defendants'
witnesses, Adams and Foster, who were members of the Louisi-
ana board from its first organization, is to the same effect in
regard to the special advantages expected to accrue to the
blind of Louisiana by joining with the boards of other States
in the establishment of a general institution. In fine, the
Louisiana board, by virtue of their distinct organization, their
separate position, the local character of their operations, and
their just expectations of special benefit to the blind of their
own State, not only had a right, but were under an obligation,
to take due care that the institution to which their fund should
be intrusted was such an institution in its objects and consti-
tution as was contemplated when the scheme was undertaken
and entered into, and not one materially different therefrom in
either respect.

We think, therefore, that the defendants, when they found
that the constitution of the Kentucky corporation had been
materially changed, and their share in its management and
control had been superseded by a totally different arrange-
ment, in which their influence was, or might be, totally anni-

hilated, were justified in refusing to pay over to such alleged body the funds in their hands.

The complainants, however, contend that the actual trustees of the Louisiana board have admitted the right of the complainants, and are therefore estopped from setting up the defence which we have been considering. It is very questionable whether the personal admissions of the individual trustees are entitled to any weight in such a case. But a careful examination of the whole evidence convinces us that no admissions of the kind, made under a full and fair knowledge of the circumstances, have been made by the Louisiana trustees. Indeed, the argument might well be retorted, that the complainants, by their great delay in demanding the fund, — a delay of fourteen or fifteen years, or, throwing out the period of the civil war, a delay of eleven years, — are estopped from prosecuting for it now. No formal demand was made until the year 1876. An agent was sent to New Orleans in 1871, it is true, to get aid from the Louisiana board, and to inquire into their mutual relations. But the latter always referred to legal impediments which would at least require the aid of legislation to remove. What the nature of these impediments were does not clearly appear. But we may presume that the Louisiana board had in view the change which Mr. Sherrod reported to them had been made in the Kentucky charter, the nature of which, however, had not been distinctly explained to them. In answer to a communication from Mr. Huntoon, secretary of the Kentucky board, Mr. Foster, the secretary of the Louisiana board, wrote the following letter in 1872, which seems to throw some light on the subject : —

"DECEMBER 22, 1872.

"B. H. HUNTOON, Esq.,
     *Sec't'y Am. Printing House for the Blind, Louisville, Ky. :*

"DEAR SIR, — Your favor of Dec. 11th is at hand, and contents noted, but board of trustees are not in condition at present to appropriate funds to any purpose. When the board meets, your communication will be laid before them. Though not authorized to speak on their behalf, I may add that the change in your charter may be found upon examination, probably, to seriously change the relations of our board to yours.

"Our board will probably have a meeting in course of the coming spring.                                "W. H. FOSTER,
                                                "Secretary, &c."


This was certainly a very pregnant intimation of the objection which lies at the foundation of the defence in the present case.

It is true that in 1876, when the defendants were sued by several of their original donors for the recovery of their contributions, on the ground that the conditions of raising $25,000 within seven years, and of establishing a printing house within nine years, from the date of the charter, had not been complied with, the Louisiana trustees made inquiry as to these points from the complainants. They also had, or some of them had, a conference with Mr. Barrett, the treasurer of the Kentucky corporation, and inquired of him as to the change in their charter, which had been reported by Mr. Sherrod. They testify that Mr. Barrett assured them that Sherrod was entirely mistaken; that no material change had been made in their charter, and that they were acting under the original charter of 1858; at least, so he was understood by them. The defendants' counsel, acting on the supposition that these representations were correct, prepared the defence of the board accordingly; and being satisfied that the amount of $25,000 had been raised within the seven years, and that an establishment sufficient to answer the requirements of the charter had been started within the nine years, on that basis contested the suits brought by the donors. During the progress of that litigation, however, having procured and examined the amended Kentucky charter of 1861, his views were entirely changed on the subject of the right of the Kentucky corporation to demand the fund.

This is, in substance, the admission which is relied on by the complainants. We think it is quite satisfactorily explained in the testimony of Judge Merrick and Mr. Adams; and that it cannot, in the slightest degree, affect the rights of the parties in this case.

It is unnecessary to inquire what should be done with the fund in question. The original scheme has failed. The

cross-bills of the donors, who were made defendants in the case, were dismissed without prejudice, and they have not appealed. The legislature of Louisiana, by an act passed May 14, 1878, authorized the trustees, in their own exoneration, to pay the whole fund into the State treasury so far as the same remained in their hands unclaimed by the contributors; and appropriated the same as a special and inviolable fund for the sole and exclusive benefit of the Louisiana Institution for the Blind and the Industrial Home for the Blind, domiciled at Baton Rouge in said State. An additional section provides for paying to any original contributor, on judicial proof of his claim, the amount contributed by him, with interest. We have no doubt that the fund will be properly administered and disposed of under the laws of Louisiana, to whose superintending care the matter rightfully belongs.

It is proper to add that, in our view of this case, the general doctrine of charities has nothing to do with its decision. When a charitable trust has been fully constituted, and the funds have passed out of the hands and control of the donors, and into the hands of the proper institution, or organization, intended for its administration, the Court of Chancery, or some analogous jurisdiction, becomes its legal guardian and protector, and will take care that the objects of the trust are duly pursued, and the funds rightfully appropriated. But where contributions to a charity are proposed to be made upon certain express conditions, the rights of the donors stand upon contract; and if the conditions are not performed, their obligation to contribute is discharged.

*Decree affirmed.*