HERMAN GOEDEL, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 84118.    Promulgated January 3, 1939.

*Norman W. Schur, Esq.*, for the petitioner.
*E. M. Woolf, Esq.*, for the respondent.

4

OPINION.

HARRON: The petitioner's liability for income tax upon an amount added to his share of income received in 1933 from the copartnership

of Jacquelin & De Coppet, depends upon whether certain insurance premiums are deductible from the income of that copartnership as ordinary and necessary expenses incurred in carrying on its trade or business.[1] The insurance in question was insurance for a term on the life of the President of the United States. We do not have to consider any question relating to the refinements of insurance law, i. e., whether or not the insurance was life insurance. For the purposes of considering the issue before us, there can be no question that the insurance premiums are premiums paid on insurance on the life of an individual and that the beneficiary of the policies was the taxpayer, who took out the policies. The deduction for the premiums is allowable only if it is an ordinary and necessary expense of the business. *Berizzi Brothers Co.*, 16 B. T. A. 1307. We do not believe it necessary to consider a related question, namely, whether the expenditure comes within the intendment of the section relating to nonallowable deductions, namely, section 24 (a) (4) of the Revenue Act of 1932.

Respondent denied the deduction on the ground that the expenditure in question has no relation to the profit-making activities of the business and is not the type of expenditure deductible under section 23 (a) of the Revenue Act of 1932. Petitioner has the burden of proving that the respondent's determination is wrong. *Wickwire* v. *Reinecke*, 275 U. S. 101. Respondent contends that the expenditure is not deductible as an ordinary and necessary business expense; that the partnership did not have an insurable interest in the life of the President of the United States; and that the policies for which the premiums were paid were void as against public policy.

Petitioner contends that the expenditures for the insurance premiums are such expenses as are deductible under section 23 (a) because the business interests of the copartnership were the immediate cause for incurring the expense and because the members of the copartnership made the expenditure in good faith upon the belief that the expenditure was necessary in view of an unusually large inventory of securities accumulated in the early part of 1933, as well as for other reasons evident from the findings of fact. The petitioner contends that the expenditure was a necessary one in that presumably prudent business men, i. e., the members of the copartnership, considered that the expenditure was necessary for the protection of their investments

---

[1] The Revenue Act of 1932, section 23, provides that:

"In computing net income there shall be allowed as deductions:

"(a) Expenses.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

Section 183 provides:

"The net income of the partnership shall be computed in the same manner and on the same basis as in the case of an individual, except that the so-called 'charitable contribution' deduction provided in section 23 (n) shall not be allowed."

in their business.  Petitioner contends that the insurance was a form of business insurance to protect an inventory of goods or that it is similar to expenditures made in hedging operations, which are undertaken to reduce the element of speculative risks on a market.  Petitioner contends that continuance of the life of the President of the United States was of advantage to the business of the copartnership and that it had an insurable interest in the life of the President.  In this connection, we are asked to take notice of the events of deaths of two former Presidents of the United States, President McKinley and President Garfield, and of the fact that following each demise, market prices of securities declined severely; also, that in standard works on insurance law it is reported that stockholders in companies financed by J. Pierpont Morgan have taken out insurance on his life.  Finally, it is contended that to be deductible an expenditure does not need to be both ordinary and necessary.  Petitioner relies on *Harris & Co.* v. *Lucas*, 48 Fed. (2d) 188, to support his argument that the statutory provision contained in section 23 (a) is to be broadly construed and that the terms "ordinary" and "necessary" are not used conjunctively, i. e., that if the expenditure is "necessary" in the conduct of business, the requirement of the statute is met and the deduction should be allowed.

To be deductible under section 23 (a) the expenditure must meet all of three requirements; it must be both ordinary and necessary, and it must proximately result from the ordinary conduct of business.  See Klein, Federal Income Taxation (1929), p. 394; *Welch* v. *Helvering*, 290 U. S. 111.  This Board has previously considered the decision of *Harris & Co.* v. *Lucas*, *supra*, and the substance of the court's opinion in that case and has pointed out that the Supreme Court in *Welch* v. *Helvering*, *supra*, in construing an identical provision of the revenue acts, has given a construction to the statute contrary to that of the Circuit Court in the *Harris* case.  The Supreme Court has made clear the rule that a business expense, to be deductible under the business expense provision of the statute, must be not only a necessary expense but also an ordinary expense.  See *Foye Lumber & Tie Co.*, 33 B. T. A. 271.

While there is a great difference in the nature of the facts and circumstances surrounding the expenditures involved in this proceeding as compared with the expenditures, facts, and circumstances in the *Welch* v. *Helvering* case, the question in this proceeding is essentially the same as the question involved in the *Welch* case.

It is pertinent and helpful to quote at length from the Court's opinion in *Welch* v. *Helvering*, *supra*.  The Court said there:

We may assume that the payments to creditors of the Welch Company were necessary for the development of the petitioner's business, at least in the sense

that they were appropriate and helpful. *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579. He certainly thought they were, and we should be slow to override his judgment. But the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary. Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser* v. *United States*, 276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type.

The first question is whether the expenditure for the particular insurance premiums was an ordinary expense. On its face, an expenditure for insurance on the life of the President of the United States by a firm dealing in securities, under the facts, is not ordinary in the sense of being customary or usual. The only grounds upon which petitioner claims that the expenditures are deductible are (1) that the general condition of the securities market, in early 1933, and the partnership's "long" position, was unusual, and (2) that the "insurance" purchased was similar to "business" insurance.

(1) Considering the first basis for petitioner's claim, it appears that Jacquelin & De Coppet took a "long" position in its purchases of securities, investing large sums in early 1933 to take advantage of cheap prices for securities. Large purchases were made early in the year instead of spreading purchases more evenly over the year. It must be assumed that other dealers in securities may have taken a "long" position in securities at about the same time. It is reasonable that others would avail themselves of the then prevailing low market prices. It is admitted that one of the risks of the business of any dealer in securities is fluctuations of market prices of securities. Any dealer in securities assumes proportionate increases of this risk when he undertakes to buy and accumulate a large inventory of securities. Jacquelin & De Coppet is a large firm in their business, no doubt larger than most firms of dealers. But its desire to find some way of insuring against loss a large inventory of securities can not be regarded as essentially any different from what must be the desire of every dealer to protect his inventory of securities from loss from declines in prices. In the absence of any evidence to show that others in the same business at the same time purchased similar or

the same insurance, it must be concluded that there was really no extraordinary or unusual aspect to the position of Jacquelin & De Coppet, in early 1933, that would make the expenditure in question an ordinary expenditure within the meaning of the statutory provision. If low prices and new business confidence are favorable factors to the business of buying securities for sale at a profit, the condition of the securities market in early 1933 was very good. The morbid contingency that the copartnership sought protection against was entertained, so far as the record shows, only by members of the copartnership to the point of purchasing "insurance" on the life of the Chief Executive. Judged by normal standards of conduct in the securities business, in so far as the record before us shows, the means employed by the copartnership was not in accord with any prevailing business practice. It must be concluded that the expenditures in question were not ordinary business expenses, because of any conditions peculiar to the copartnership.

(2) It is generally recognized that the purchase of insurance to cover property loss is ordinary and prudent business practice. But there are risks incident to the conduct of the securities business that can not be insured, as a practical matter. One of petitioner's witnesses testified that he did not know of any customary, established form of insurance that would cover losses of a dealer in securities against fluctuations in market prices. It is an essential characteristic of insurance that there be a proximate relation between the loss sustained and both the event insured against and the indemnity received. Thus, fire insurance is insurance against loss proximately caused by fire and the amount which the underwriter agrees to pay is the amount of the loss sustained, which may be less than the face amount of the policy purchased. The "insurance" purchased by Jacquelin & De Coppet did not, by its terms, refer to loss from the sales of securities within a specified time. Such possible losses were contemplated by the copartnership, of course. But the event insured against was the demise of the President. Such event was not only remote but also is only one of the many possible causes of fluctuations in market prices. The policies purchased were contracts to pay a sum certain, and no less, in the event of the death of the life assured on or before a certain date. While it may have been agreed outside the terms of the particular insurance contracts that no payments would be made if no losses from sales of securities were sustained, nevertheless there was no contractual limitation of indemnity to be paid to actual losses that might be sustained. Thus, there was lacking in these contracts the essential characteristic of insurance, i. e., the co-relation of indemnity to be paid to loss sustained. The contracts in many respects resemble wagering contracts.

A wager is defined in Funk & Wagnalls' Standard Dictionary as follows:

Wager, An agreement between two or more persons that a certain sum of money or other thing shall be paid or delivered to one of them on the happening or not happening of a specified (but uncertain) event.

It is urged that the "insurance" in question is the same or very similar to what is called "business insurance." We understand this reference to be to such standard life insurance as is sometimes purchased by a business firm on the life of some individual closely related in some way to the business. The theory of such insurance is that the demise of the individual constitutes a loss to the business, because of the relation of the individual to the business, and the relationship is such that the beneficiary has an *insurable interest* in the life of the individual. There can be no question that the copartnership of Jacquelin & De Coppet did not have any insurable interest in the life of the President of the United States, upon any theory. It is an exceedingly novel theory that a business firm does have such insurable interest. Carried out, this theory amounts to saying that every business firm and every individual engaged in business in the United States has an insurable interest in the life of the President of the United States. The theory is not only fantastic but, if accepted, would introduce into the field of business insurance and business contracts grave questions of public policy. While it seems scarcely necessary to cite insurance law on the matter of what constitutes an insurable interest, and what constitutes a valid insurance contract, we refer to well known principles.

In *Warnock* v. *Davis*, 104 U. S. 775, an insurable interest is defined as follows:

* * * such an interest, arising from the relations of the party paying the insurance either as a creditor of or surety for the assured, or from the ties by blood or marriage to him as will justify a reasonable expectation of advantage or benefit from the continuance of his life.

It is well settled law in this country that a valid policy of insurance can not be taken out by one person for his own benefit on the life of another *in which he has no insurable interest.* 37 Corpus Juris 385; sec. 51; *Warnock* v. *Davis, supra; Steinback* v. *Diepenbrock,* 37 N. Y. S. 279; *Hess' Administrator* v. *Legenfelter* (Ky.), 105 S. W. 476. In New York State there is statutory provision against issuance of insurance on the life of another, *except upon application of the person insured.* The statute provides (McKinney's Consolidated Laws of New York, book 27, par. 55) that:

* * * No policy or agreement for insurance other than a policy of group life insurance described in clause (d) of subdivision two of section one hun-

dred and one–a of this chapter shall be issued upon the life or health of another or against loss by disablement by accident except upon the application of the person insured; * * *

When Jacquelin & De Coppet applied for and obtained the contracts under consideration here, the President of the United States did not sign the applications to an English assurance company for term insurance on his life. The negotiations appear to have been secret and from the record it is clear that the President was wholly unaware of the applications for and the issuance of the policies.

It seems evident that the contracts entered into by Jacquelin & De Coppet with an English company were illegal under the laws of New York. While they may have been valid under the laws of England, a point we do not decide, it seems evident that the contracts were not enforceable in the State of New York. The law will not enforce what it has forbidden and denounced. "Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality, *or our public policy*." [Italics ours.] Story, Conflict of Laws, sec. 258; *Ocanyon* v. *Winchester Repeating Arms Co.*, 103 U. S. 261.

Judged by standards of what is ordinary, "according to the ways of conduct and forms of speech prevailing in the business world," *Welch* v. *Helvering*, *supra;* and by what similar conduct arises under similar situations, *Amtorg Trading Corporation* v. *Commissioner*, 65 Fed. (2d) 583, it is most doubtful whether other business concerns in New York State, or elsewhere in this country, accustomed to buying insurance in connection with their business, would expend funds of the business upon contracts in the nature of wagering contracts, subject to being defeated on grounds of invalidity and violation of public policy.

We hold that the expenditures in question are not ordinary business expense within the meaning of section 23 (a) of the Revenue Act of 1932.

We do not believe the expenditure in question meets another requirement of a deductible business expense, i. e., it appears to us *not* to be an expenditure incurred in the normal course of business. The record reveals no facts to show that any business firm has ever purchased a policy of insurance on the life of the President of the United States without his own application for the insurance. Further, as stated above, the event insured against was not only remote, but also only one of the possible causes of fluctuations in the market prices of securities such as are found in bank and business failures, declaration of war, and what are generally described as economic factors, all of which are likely to occur irrespective of continuance of life of the Chief Executive of the country.

It is doubtful whether the expenditure was necessary, even in the sense of being "appropriate and helpful", with due regard for the theories that influenced members of the copartnership in making a large expenditure. Even in the considerations of the members of the copartnership, it does not appear from the record, that they thought there was any condition prevalent throughout the United States that created any emergency for or imminent danger to the business of dealers in securities such as to warrant obtaining such contracts. Cf. *First National Bank of Skowhegan, Maine*, 35 B. T. A. 876. Of course, there was a very remote chance that such expenditure would be of benefit to a business, but the members of the copartnership apparently were the only persons in their field of business who considered "necessary" such an expenditure. While conditions in 1933 may have been unusual as compared with prior years, and the position of the copartnership unique in 1933 with respect to its "long" position in securities, it appears from the record that the expenditure was *wholly unique* in the business history of this country. Where, as here, the expenditure is so unusual as never to have been made, so far as the record reveals, by other persons in the same business, *when confronted with similar conditions*, and we have particular reference to the fact that the insurance was upon the life of the President of the United States, then we do not think the expenditure was ordinary or necessary, so as to be a deductible business expense within the intendment and meaning of the statute. At best, the expenditure falls within "those general costs of protecting one's property for which the statute makes no allowance." *Commissioner* v. *Field*, 42 Fed. (2d) 820.

Upon our conclusion that the expenditures in question are not deductible business expenses under the revenue act, it is not encumbent upon us to make any conclusion upon any question of public policy. The determination of the Commissioner in this proceeding is sustained.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

LEECH concurs only in the result.

---

SMITH, dissenting: I am of the opinion that a business enterprise which, as an incident to the carrying on of its trade or business, pays a premium on an insurance policy to insure itself against loss is entitled to deduct from its gross income the premium paid as an "ordinary and necessary" expense of carrying on the trade or business within the meaning of section 23 (a) of the Revenue Act of 1932. If the insurance policy were a casualty insurance policy to insure against loss from theft, from storm, or from other casualty, I apprehend that no question would be raised as to the deductibility of the

item.  I do not see how a different result can be reached where the policy is on the life of the President of the United States for a limited period.  The character of the expense does not depend upon whether the apprehended loss is from the death of the President or from any other source.

I am of the opinion that the premium is a legal deduction from gross income, in accordance with *Kornhauser* v. *United States*, 276 U. S. 145.  In that case it was held that fees paid to an attorney for defending an action for accounting instituted by a former partner are deductible from gross income as ordinary and necessary expenses paid or incurred during the taxable year in carrying on the business, under section 214 (a) (1) of the Revenue Act of 1918, since, where suit against the taxpayer is directly connected with business, the expense incurred is a business expense.  The Court held that the expense proximately resulted from the carrying on of the business.  That is the situation here.  I do not think that the opinion of the Supreme Court in *Welch* v. *Helvering*, 290 U. S. 111, is opposed.  It seems to me that the language used by the Court in that opinion supports the contention of the petitioner herein.