J. E. TAYLOR, Attorney General of the State of Missouri, Appellant, v. L. W. BALDWIN, JR., D. K. CATLIN, CHARLES E. CLAGGETT, FRANK B. COLEMAN, SAMUEL D. CONANT, J. LIONBERGER DAVIS, MAJOR B. EINSTEIN, CLARK R. GAMBLE, EDWIN S. JONES, CHARLES F. KETTERING, HENRY PFLAGER, HENRY RAND, CHARLES M. RICE, MRS. L. B. SAYMAN, A. L. SHAPLEIGH, II, JOHN R. SHEPLEY, ROBERT B. SMITH, MRS. F. J. TAUSSIG, DR. CHARLES A. THOMAS, DAVIS WOHL, MRS. HARRY E. WUERTENBAECHER, BERTHOUD CLIFFORD, DR. M. F. ENGMAN, SR., CHARLES M. HUTTIG, THE BARNARD FREE SKIN AND CANCER HOSPITAL, a Corporation, and RIGHT REVEREND WILLIAM SCARLETT, Bishop of the Protestant Episcopal Church, Respondents, No. 42741—247 S.W. (2d) 741.

Court en Banc, April 14, 1952.

*J. E. Taylor*, Attorney General, and *Frank P. Motherway*, Assistant Attorney General, for appellant; *Jacob M. Lashly,* and *Paul B. Rava* of counsel.

*Henry B. Pflager, Richard L. Eckhart* and *James M. Douglas* for respondents The Barnard Free Skin and Cancer Hospital and the Majority Members of the Board of Directors; *Orr, Pflager, Foulis & Andreas* and *Thompson, Mitchell, Thompson & Douglas* of counsel.

1228

1230

*Coburn, Storckman & Croft* and *Clem F. Storckman* for respondents Trustees.

*James E. Crowe,* City Counselor, and *John P. McCammon,* Associate City Counselor, amici curiae.

■■■■ CONKLING, J.—On March 14, 1950, the Attorney General (hereinafter called appellant) filed this action in the circuit court praying injunctive relief and the removal of certain trustees. Defendants are those named trustees, The Barnard Free Skin and Cancer Hospital, a corporation, of St. Louis, Missouri (hereinafter called Barnard) and the 24 members of the Board of Directors of Barnard, 21 of whom, as such directors, have voted to accept a contract of affiliation with Washington University and to relocate Barnard at the Washington University Medical Center in St. Louis, Missouri. The action also sought to enjoin that affiliation and relocation. The Chancellor below dismissed the appellant's petition and the latter has appealed from the decree and declaratory judgment entered in the trial court.

The first 21 named individuals in the caption above are the directors who favor the affiliation. Defendants Berthoud Clifford, Dr. M. F. Engman and Charles M. Huttig, the minority members of the Barnard Board of Directors, who dissented from the action of that Board accepting the contract of affiliation filed a separate "Affirmative Answer" opposing the affiliation, but did not appeal from the decree dismissing their separate answer.

■■■■ The defendants John R. Shepley, Chas. M. Rice, Robert B. Smith, Edwin S. Jones and Rt. Rev. William Scarlett, in their capacities as trustees of the testamentary trust under the will of George D. Barnard (and whose removal as such trustees is prayed in the petition) filed a separate answer and have filed a separate brief here. The first four above named trustees are also members of Barnard's Board. The city of St. Louis has filed an amicus curiae brief.

It is alleged in the petition that Barnard was built, founded and organized by gifts from George D. Barnard and his wife (who lived

in St. Louis) made on condition that the services of the hospital and of its medical staff would be furnished free to indigent persons afflicted with cancer or skin diseases, and that Barnard's present corporate name remain unchanged; that such services are now being furnished by Barnard free of cost; that the Directors of Barnard, under the affiliation contract, now propose to sell the present Barnard hospital buildings at Theresa and Washington Avenues in St..Louis, acquire a tract of land at the Washington University Medical Center in St. Louis to erect thereon a building to be called the Barnard Free Skin and Cancer Hospital to be used to there treat persons suffering from cancer and skin diseases, and to there operate the same in conjunction with the Wohl Cancer Hospital, Barnes Hospital, McMillan Hospital, the St. Louis Children's Hospital and the Maternity Hospital, all in the Washington University Medical Center. The petition also charges that if said affiliation is effected there will be no free clinic and that the present medical staff of Barnard "will be disbanded". The petition prays that defendants be enjoined from carrying out the contract of affiliation with Washington University, it being alleged that such plan "would. be a distinct departure from the intention of the original incorporators" of Barnard, that it violates Barnard's charter or Articles of Agreement, certain conditions of certain deeds of gift and the George D. Barnard testamentary trust and will result in abandoning the present Barnard Hospital and free clinic.

Barnard and the 21 majority directors in their joint answer denied the most of plaintiff's petition, and admitted they had approved and accepted the affiliation contract. They also counterclaimed for declaratory judgment relief. They pleaded the purposes of Barnard's charter, the contract of affiliation, the certain deeds of gift from and the wills of George D. Barnard and wife, the benefits to accrue from affiliation and the financial problems now facing Barnard; they prayed the Chancellor to construe Barnard's charter, the contract of affiliation, the deeds of gift and the wills of George D. Barnard and wife; and to declare their rights, powers and duties under those instruments with respect to the contract of affiliation and to approve the contract of affiliation and decree Barnard's acceptance thereof.

The separate answer of the defendant trustees denied most of the allegations of plaintiff's petition and alleged that (1) Barnard has not had and does not have "a sufficient amount of money to assure the continuity of its maintenance for the future in an efficient manner so as to render its greatest public service", (2) it is the intent of the proposed affiliation to operate the proposed new hospital in accordance with the gift deeds and the trust, and to carry on Barnard's services, (3) the name of Barnard will not be changed, and (4) that in Mr. Barnard's will, other than the restriction as to any change in Barnard's corporate name, there is no restriction upon the continued

payment by the trustees of the income of the trust to Barnard. It was specifically denied that the will of Mr. Barnard provided that the payments from the trust to Barnard should terminate if Barnard should cease to afford free treatment. The trustees' answer also adopted the allegations of Barnard's counterclaim for declaratory judgment relief and joined in Barnard's prayer for a declaratory judgment.

The paramount issue before the Chancellor and now before this court is whether the approval and acceptance of the affiliation contract by Barnard's Board of Directors was within Barnard's charter powers and the provisions of the hereinafter referred ▇ to deeds of gift from George D. Barnard and wife, and their wills. The above mentioned documents were received in evidence, but all are too long to be set out or even digested in this opinion. The issues presented to the Chancellor mixed questions of law and fact upon which he properly received evidence. Evidence was received as to meaning of the documents defining the purposes of Barnard and the power of its directors, and the meaning of the documents of affiliation; whether there was any conflict between the contract of affiliation and Barnard's purposes and powers; whether the acceptance of the contract of affiliation was a reasonable exercise of the discretionary powers of Barnard's Board of Directors; and whether the proposed affiliation is in fact reasonable and desirable for the better care of indigent cancer and skin disease patients.

The evidence in the case and the exhibits received and filed here took a wide range. The transcript contains more than 800 pages. Forty-three documentary exhibits were introduced. Some of the exhibits are forty typed pages in length. The history of this public charity, its service to the public, the economic situation confronting a free hospital in this inflationary era, the modern trend to medical centers, and the claimed benefits as well as the claimed detriments of the proposed affiliation have received much attention in the oral testimony of witnesses who had quite definite views on those matters. Among the witnesses were men outstanding in nearly every field of medicine and research, and men outstanding in the business world. There are many disputes of fact and differences of opinion in the testimony. Not even the men of medicine agreed with each other. The evidence has been carefully examined but it is impossible to even refer to all of it within the limits of this opinion. But this is largely a fact case. And many facts must be here stated.

What is now Barnard was first organized by pro-forma decree in 1905 as The St. Louis Skin and Cancer Hospital, under Article XI of Chapter 12, of R. S. Mo. 1899, as a benevolent corporation. A society was organized of those interested in the hospital. Certain of them agreed to and did make substantial contributions. Defendant Dr. M. F. Engman is the only surviving incorporator. He is now one of the

1234

three dissenting directors. The original hospital was at Jefferson and St. Charles Streets. On May 29, 1908 George D. Barnard and wife by deed of gift conveyed a tract on Forest Park Boulevard and gave the St. Louis Skin & Cancer Hospital $86,500 and the real estate to erect suitable hospital buildings thereon. The Barnards then concluded that tract was unsuitable and it was sold. On January 26, 1909 they conveyed by a similar deed of gift the present tract at Theresa and Washington Streets to the St. Louis Skin & Cancer Hospital on the condition it would erect·a suitable hospital on that tract. Erection of that (the present) building was completed in 1910. It has been in use now for 42 years. The gift deeds from Mr. Barnard and wife were subject to these express conditions: (1) use of the $86,500 to erect on the tract and equip the hospital to be used in carrying out its objects; (2) change of the corporate name to, and to forever remain, ''The Barnard Free Skin and Cancer Hospital''; (3) the hospital to be and remain a free hospital for the indigent; (4) the property not to be alienated, except that if, ''by reason of the changes of conditions surrounding the location'', the Board should determine that the location ''has become unfavorable for the maintenance of the hospital''; and other conditions unimportant here. The above conditions were' complied with in 1910 when the Articles of Agreement were amended and the corporate name changed to ''The Barnard Free Skin and Cancer Hospital.'' On December 9, 1913 Mr. Barnard and wife made another deed of gift, subject to like conditions, and conveyed the real estate to provide land for a nurses' home.

The will of George D. Barnard, probated June 7, 1915, created a trust with the residuary income therefrom payable to Barnard, on condition that: no more than $5,000 of such income be used annually for research; and·that if Barnard's corporate name be changed the interest of the hospital in the trust income would terminate and the income become payable to the Bishop of the Protestant Episcopal Church. The will of his wife, Mary L. Barnard, who died January 2, 1934 provided that the assets of her estate in excess of $500,000 should be distributed to the Endowment Fund of Barnard, provided, however, that if Barnard's corporate name be changed such endowment should go to the St. Louis Children's Hospital. From the testamentary trust in Mr. Barnard's will Barnard has received an average of $8100 annually for 34 years. Under its charter Barnard is required to be supported by dues, contributions, bequests and endowment income. Barnard has no pay patients. It cannot treat patients who can afford to pay. Its medical, surgical and nursing services must be given to indigent persons only. It has no operation income. Its entire income must come from outside sources. In the year 1949, Barnard rejected 1292 persons as patients because 'they were not indigent.

As expressed in its charter, "The objects * * * (of Barnard) are the establishment, support and management of an institution * * · * for the purposes of affording medical and surgical aid and nursing to persons suffering from skin diseases or cancer", etc. It is agreed that, by the charter, all managerial powers of Barnard are vested in a Board of Directors of 24 members who, as there stated, "* * * shall have full power * * * to make such rules and regulations as are necessary for the government of its affairs and the management of the medical and business affairs * * * elect members of the Medical Board * * * officers, superintendents", etc.

From its inception Barnard has operated a bed hospital of 42 beds with surgery and nursing for in-patients, and a clinic for out-patients. It later started a cancer research program. No basic or fundamental research is now carried on at Barnard because of lack of funds. Fundamental cancer research is of inestimable value. Under this proposed affiliation the fundamental cancer research work will be resumed, and Barnard will have more and better research facilities and be thus more effective. Cancer research is a necessary precedent to the dissemination of knowledge respecting cancer. Barnes Hospital has a world wide reputation in cancer research. The proposed new Barnard Hospital will have two floors devoted to cancer research by Barnard's staff. The funds for such research will "be a responsibility of the (Washington University) School of Medicine". The research formerly carried on at Barnard by Doctor Cowdry and Doctor Seelig made Barnard known internationally. Doctor Cowdry withdrew from Barnard and now works exclusively at the Medical Center because Barnard's present location was unfavorable to the continuance of his work at both places. Primary lung cancer is "the more common internal cancer" in men. The operation for a lung cancer was first performed at Barnes Hospital by the present Surgeon in Chief at Barnes. More of those lung operations for cancer are performed at Barnes than anywhere in the world. Only two thoracic operations were performed at Barnard in 1948. During the years Barnard has treated a great number of patients, furnished many clinical consultations, and has had many bed patients to whom it gave surgery. Its patients have come from a large territory, but many were from the St. Louis area. All were and are treated without charge. Its service to the indigent has been magnificent. Barnard has a large staff. The American Medical Association has approved Barnard for residency training in therapeutic radiology and in malignant diseases, but not in surgery.

BARNARD'S FINANCIAL SITUATION. Having no operating revenue Barnard is faced with serious financial problems. Barnard's capital assets aggregate about $1,635,000. The cost of caring for one patient for one day has more than doubled since 1930. In 1949 that

cost was $12.05 per day. Stipulation Exhibit 16 shows that in 1949 Barnard had income as follows: From Endowment Fund investments, $51,615.25; from donations, $61,504.20; and from the St. Louis Community Chest, $62,848.00, a total of $175,967.45. Of the above donations of $61,504.20, the Cancer Societies gave $50,000,00. In that year Barnard's expenses were $168,016.25. Under an agreement with the ▮▮▮▮ Community Chest, Barnard refunded to Community Chest the difference of $7951.20. In 1948 Barnard's Brochure demonstrated that only 35% of its income came from its endowment and that it was dependent on outside support for 65% of its operating budget. That makes its "financial position * * * quite precarious". Former members of Barnard's medical staff testified they took time from their duties to solicit contributions for Barnard. There is no assurance that the Community Chest and Cancer Societies contributions will continue. Barnard's operating expenses would be lower under the proposed affiliation and would be underwritten by the Medical Center. In 1946 a committee of Barnard's staff doctors made a study of Barnard's needs and reported Barnard's "very urgent immediate needs" to be (1) a new laboratory research addition, at a cost of $750,000 to $1,000,000, (2) a new separate building for radiological research and treatment, (3) new modern X-ray machines, (4) additional endowment for clinical radiological research and *annual* replacement of special diagnostic X-ray equipment, and (5) a pay hospital on the Barnard site to be served by the Barnard staff. No action was taken on that report. The instant affiliation contract will continue the operation of Barnard as a free hospital in affiliation with the Wohl Cancer Hospital as a pay hospital.

Negotiations for this affiliation were all begun by Barnard. They were first started in 1920, and were intermittently renewed. The subject was also discussed in 1945 and in 1947. An affiliation contract was tentatively agreed upon in 1948. The final contract submitted by the University was prepared. It was approved and accepted by Barnard's Board at its official meeting on March 14, 1950, but was not officially executed by the parties because this injunction action was that day filed.

Stipulation Exhibit 14, consisting of 40 pages, sets out the affiliation contract and certain correspondence amplifying, construing and making more definite and certain the terms of the agreement in certain respects. In addition to that hereinabove appearing, the affiliation contract provides that: (1) ownership and operation of Barnard will remain in Barnard; (2) Barnard is to sell its present buildings and facilities, purchase a site within the Medical Center, erect its own building (a 38 bed hospital) thereon and retain its corporate name; (3) Barnard's new building will be physically connected by a covered passageway with the Wohl Cancer Hospital, and the two hospitals will be operated as a functional unit; (4) Barnard's indigent out-

patients will be cared for free of charge by the Washington University Clinics; (5) heat, electricity, water, laundry, medicine, diatetic and food services will be supplied to Barnard without cost, by the Medical Center from its common facilities; (6). the Medical Center will furnish to Barnard all needed operating rooms and facilities, and all surgical, radiological and other therapeutic treatments in the Medical Center's buildings; (7) one floor of Barnard's new building will be leased to the Medical Center as a record room for the entire Medical Center; (8) central skin and tumor clinics will be operated and . financed by the Washington University Clinics; (9) Barnard will have its own separate medical staff, and only the Barnard staff will treat Barnard patients, following the patients throughout the Medical Center wherever they need care and attention; (10) Barnard will have only its own patients, will determine who shall be admitted to its hospital and will afford its medical, surgical and nursing services free of charge;

(11) new appointments to Barnard's medical staff are to be recommended by the Joint Medical Advisory Committee, and made by Barnard's Board; (12) any deficit in Barnard's operating expenses will be paid by the Medical Center; (13) Barnard is to maintain the non-hospital parts of its building; (14) Washington University Medical School is to assume the operating expenses of Barnard's research program; (15) all the facilities of the entire Medical Center will be available for the treatment and care of Barnard's patients without charge, including specialists in every field of medicine; (16) the Institute of Radiology at the Medical Center, the operating rooms and other facilities there will be used by Barnard's patients under the direct care of Barnard's staff; (17) Barnard will resume basic fundamental research in its field, and will continue the dissemination of information concerning it in Barnard's building; (18) and the term of the basic contract is 30 years, subject to termination upon a 3 year written notice.

It appears that under the proposed affiliation many special services will be available without cost to Barnard's patients at the Medical Center. These include special surgery of all kinds. At the Medical Center there are now eight floors devoted exclusively to radiology equipment and treatment; twenty-six diagnostic units all modern and up to date; radio-active iodine, phosphorous and gold; psychiatric services; modern anesthesia equipment, using caudal anesthesia and anesthesia by injection; much better nursing services will be available at the Medical Center; at the Medical Center are 16 dietitians, special diet kitchens, and intravenous feeding and amino acids are available; the Medical Center has 26 diagnostic units while Barnard. has only three, and the .Medical Center's X-ray and radiological laboratories are considered the equal of any in the country; Barnard has no blood bank but the Medical Center blood bank (supplying an

average of 25 transfusions a day) will be available to Barnard patients. 'Barnard now has no interns, but they are used throughout the Medical Center.

Barnard's present building, of four floors, was modern in 1910. Maintenance demands there are now extensive and such costs are high. The plan of its plumbing has been lost. The pipes are laid in concrete. The heating equipment is not adequate. At the Medical Center, Barnard will have a new modern 7 story building. It will be a functional unit with the Wohl Cancer Hospital, and the two hospitals will have about 100 beds, the smallest economical unit. Over the past 15 years the average occupancy of Barnard was 35 3/4 beds per day for its 42 beds. Other facts will be later noticed.

The Chancellor filed a memorandum opinion. In the decree and declaratory judgment entered below the Chancellor found that there here existed a justiciable controversy and that a "judicial declaration of rights * * * should be made", and found the issues in favor of Barnard and the majority directors, and in favor of the trustees, and also found the issues against the appellant and the minority directors.

The Chancellor further found and declared that (1) the proposed affiliation "is in the public interest and will benefit the citizens * * * to the welfare of the indigent patient and the better fulfillment of the public trust"; (2) Barnard's Articles of Agreement or charter gave its Board full power of management, supervision, control and visitorial powers; (3) Barnard's dominant purpose and object, as expressed in its Articles of Agreement and as reflected also in the deeds of gift from George D. Barnard and wife, and their wills, is the establishment and maintenance of a free hospital affording medical and surgical aid and nursing, and the care and treatment of indigent persons afflicted with cancer, skin and allied diseases, the study of such diseases and the dissemination of knowledge concerning them, and that the above mentioned instruments, neither expressly nor inferentially, prohibit affiliation with a University or a Medical Center; (4) the right to accept or reject the proposed affiliation is within the powers of Barnard's Board, and that the Board's action accepting the contract of affiliation is proper and is approved, and is not violative of Barnard's object and purpose but is in harmony therewith, and that the contract of affiliation continues to vest full powers of ownership, management, government, control and operation of Barnard in its Board of Directors;

(5) The proposed affiliation will (a) retain Barnard's corporate name, (b) retain the present high standards of competency and ability of Barnard's medical staff and continue it into the future, (c) improve and expand Barnard's available facilities for its free treatment of its class of patients, (d) improve and increase Barnard's nursing personnel and facilities, (e) increase Barnard's opportunities and

facilities for the training of young doctors, (f) continue Barnard's present research facilities, and improve and increase its future research ▮▮▮ work in the field of cancer; (g) assure Barnard's future financial support and maintenance, and that the assumption by others of Barnard's future deficits, under the affiliation contract, will be a "contribution" within Barnard's Articles of Agreement, (h) not result in the delegation of any authority of Barnard's Board but will continue the Board's control and administration of Barnard's fiscal policy, funds, expenditures, endowment income, future gifts, professional policies, appointments to and government of its medical staff, the appointment and supervision of Barnard's administrator and director, its record room and the Board's authority· to lease a portion thereof, (i) continue Barnard as a separate and independent entity, and, as a free hospital, Barnard will be able to continue its present work and charter purposes, resulting in a *new* hospital used for the purposes specified in Barnard's Articles of Agreement, the gift deeds and the trust, and for no other purpose or purposes whatever;

(6) Barnard's Board found the present location of the hospital to be "unfavorable" and that it is to Barnard's best interest that the hospital be moved from its present location, and the Chancellor further found and declared that the present location has become "unfavorable" as used in the deeds of gift; and that "unfavorable" as there used means unfavorable economically as well as physically, and comparatively as well as abstractly; (7) Barnard's Board has authority to sell the present hospital buildings, furnishings and site, and that it is authorized to do so, and is further authorized to buy a hospital site within the Washington University Medical Center at Kingshighway and Euclid in St. Louis and to erect and maintain a hospital building thereon for hospital uses as the hospital is now used, and none other, and that the Board is authorized to pay for, improve and furnish the same; (8) Barnard's Board accepted the affiliation contract in proper form at a proper meeting by more than a majority vote and that such acceptance is approved by the Chancellor and is binding upon Barnard and its directors; but, with the following stated exceptions: (a) Barnard may not have one of its directors, as an official representative of Barnard, on the Board of Managers of Washington University Clinics, and (b) Barnard shall not permit Washington University Skin Clinic to use the name "Barnard" or "Barnard Skin Clinic"; (9) the defendant trustees have violated no duty and no cause for their removal ·has been shown; (10) the trustees' duties are stated in the will of George D. Barnard; (11) and that the trustees cannot terminate the payments from the testamentary trust to Barnard unless Barnard's corporate name is changed, and that there is no intention to change that name.

The case was ably argued at the bar of this court and lengthy and well-prepared briefs were filed here.

■ We restate some of the basic principles within which the questions raised by the appellant must be considered. "Any gift not inconsistent with existing laws, which is promotive of science or tends to the education, enlightenment, benefit, or amelioration of the condition of mankind, or the diffusion of useful knowledge * * * is a charity * * * and it is nonetheless a charity because not so denominated in the instrument which evidences the gift." Parsons v. Childs, 345 Mo. 689, 136 S.W. (2d) 327, Missouri Historical Society v. Academy of Science, 94 Mo. 459, 8 S.W. 346. The briefs of the parties concede that Barnard is a charity, as indeed it is. The Barnard deeds of gift created a charitable trust. Catron v. Scarritt Collegiate Institute, 264 Mo. 713, 175 S.W. 571, Buchanan v. Kennard, 234 Mo. 117, 136 S.W. 415, Lackland v. Walker, 151 Mo. 210, 52 S.W. 414, Salvation Army v. Hoehn, 354 Mo. 107, 114, 188 S.W. (2d) 826, In re Rahn's Estate, 316 Mo. 492, 511, 291 S.W. 120, 128. The courts of Missouri, and of most of the states, have adopted a liberal attitude toward charitable trusts. Where the instruments of their creation are sufficiently definite to permit of their guardianship by courts of equity such trusts are favorites of the law. Parsons v. Childs, supra, Gossett v. Swinney, 53 Fed. (2d) 772. The powers of the Barnard Board are derived from the Barnard charter. Fletcher Cyclopedia Corporations, Perm. Ed. Vol. 6, ■ § 2544, p. 432, State ex rel. Pittman v. Adams, 44 Mo. 570, 582. The Board has also such other powers as are necessary and appropriate to carry out the purposes of the charity and are not forbidden by the charter. Fletcher Cyclopedia Corporations, § 2544, and cases cited, 2 Restatement of the Law of Trusts, Section 380, p. 1174. And the Board has also visitorial powers. State ex rel. Pittman v. Adams, supra, Zollman, American Law of Charities, Section 604, p. 419.

■ Public charities are made operable and effective through the years by vesting a wide discretion as to administrative details in the Board. Buchanan v. Kennard, supra, Ratto v. Nashville Trust Co., 178 Tenn. 457, 159 S.W. (2d) 88, 141 A.L.R. 341. That discretion is "absolute" in the sense that it may not be controlled by the will of any person other than the Board. But that discretion is subject to the examination of a court of equity, and the abuse thereof may be restrained. Irwin v. Swinney, 44 Fed. (2d) 172, 177. Buchanan v. Kennard, supra, Chambers v. St. Louis, 29 Mo. 543, Hathaway v. Village of New Baltimore, 48 Mich. 251, 12 N.W. 186, Baptist Home of Monroe County v. Gardner, 145 N.Y. Sup. 275, 2 Restatement of the Law of Trusts, Section 382, p. 1178. No such discretion is so absolute as to be free from judicial examination as to whether it has been abused. Dumaine v. Dumaine, (Mass.) 16 N.E. (2d) 625, 118 A.L.R. 834. Such discretion is not required to be conferred in express terms in the charter but may be implied from the general nature of the words used. Ratto v. Nashville Trust Co., supra.

Discretionary power in those authorized to operate a public charity may be implied from words in the charter giving them power "to make such rules and regulations as are necessary for the government of its (the charity's) affairs". Zollman, American Law of Charities, § 389, 390, Buchanan v. Kennard, supra, Clayton v. Hallett, 30 Colo. 231, 261, 70 Pac. 429, 59 L.R.A. 407, Harter v. Johnson, 122 S.C. 96, 115 S.E. 217.

Those charged with the responsibility (such as the instant directors) of the operation and government of a public charity must operate it for the purposes intended (charitable purposes) "but may (in the absence of limitations in the charter) exercise a discretion as to the manner and means by which that is to be accomplished." Zollman, American Law of Charities, § 393, Parsons v. Childs, supra, Buchanan v. Kennard, supra, Pierce v. Weaver, 65 Tex. 44, 50, Clevenger v. Rio Farms, Inc., (Tex. Civ. App.) 204 S.W. (2d) 40, In re Stark's Will, (Wisc.) 234 N.W. 750. They must themselves exercise the discretion vested in them and, if it is fairly and reasonably done, that discretion will not be interfered with by the courts. The court will not substitute its judgment and discretion for that of the governors of the charity unless the governors (the Board) are guilty of misconduct, or the charity is impossible of execution, or is about to fail, or its purpose has been or is about to be perverted. Sandusky v. Sandusky, 265 Mo. 219, 177 S.W. 390, 394, State ex rel. Heddens v. Rusk, 236 Mo. 201, 139 S.W. 199, 203, Bradway v. Shattuck, (Mass.) 89 N.E. (2d) 753, 755, Holmes v. Welch, 314 Mass. 106, 49 N.E. (2d) 461, 157 A.L.R. 896, Dumaine v. Dumaine, supra.

The line of demarcation at which point the courts will interfere with the discretion of those governing a public charity reasonably is the point of substantial departure by the governors (or Board) from the dominant purpose of the charity, and, unless the directors so administer it that there is such a *substantial departure from the charity's dominant purpose* as to amount to a perversion of it the court will not interfere. Russie v. Brazzell, 128 Mo. 93, 116, 30 S.W. 526, 532, Smith et al. v. Board of Pensions of the Methodist Church, 54 Fed. Supp. 224, 236, Happy v. Morton, 33 Ill. 398, 407, Printing House for the Blind v. Louisiana Board of Trustees, 104 U.S. 711, 26 L. Ed. 902, 906, State ex rel. Pittman v. Adams, supra, In re Stark's Will, supra. See also, Parsons v. Childs, supra. The discretion of the governors of a charity must be exercised soundly, fairly and within the limits of reasonableness and it is a question of fact for the courts to decide whether such discretion has been so exercised. Zollman, American Law of Charities, § 403, p. 275; John A. Creighton Home for Girls Trust v. Waltman, (Neb.) 299 N.W. 261, Souhegan Nat. Bank v. Kenison, (N.H.) 26 Atl. (2d) 26, Frost Nat. Bank v. Boyd, (Tex. Civ. App.) 188 S.W. (2d) 199, 206.

 In the exercise of its inherent jurisdiction a court of chancery

1242

may authorize the sale of land devised originally to a charitable trust under a conditional (or even a total) restraint upon alienation where, because of conditions neither originally considered nor even foreseeable by the grantor, the further use of that land for the purpose devised will economically cripple and impair the execution of the declared purposes of the charity, and where such sale and the reinvestment of the proceeds of such sale in other property to continue the original purpose of the charity will clearly sustain the general purpose of the charity and the true intention of the grantor. Henshaw et al. v. Flenniken, et al., (Tenn.) 191 S.W. (2d) 541. See also Annotation 168 A.L.R. 1031 to 1044. Academy of the Visitation v. Clemens, 50 Mo. 167, Goode v. McPherson, 51 Mo. 126, Women's Christian Assn. v. Kansas City, 147 Mo. 103, 48 S. W. 906, Lackland v. Walker, supra. Inasmuch as there are issues of fact presented by this record upon which there was conflicting oral testimony, due deference should be accorded the findings of the Chancellor thereon, and his findings and declarations sustained "unless the proof adduced is palpably insufficient to sustain the findings, or there is a strong preponderance of the evidence to show the court should have found to the contrary." McCoy v. McCoy, 360 Mo. 199, 227 S.W. (2d) 698, 703.

■ It is clear from Articles VI and VII of Barnard's charter that its Board of Directors is there vested with full discretion as to "the goverment of its affairs and the management of the medical and business affairs" of Barnard. Operation, administration and government of this charity are vested, without charter limitation upon their discretion, in the Barnard Board of Directors. But such discretion of the Board is of course subject to examination for abuse.

It is contended by appellant that the affiliation contract is ultra vires as to Barnard, for, if permitted to be executed, Barnard would (appellant contends) violate its charter by destroying its legal entity and functional integrity. That contention seems founded upon appellant's argument that the affiliation agreement "by *depriving* Barnard of its skin and cancer clinics, of its surgical and X-ray treatment facilities * * * would destroy the legal entity and functional integrity of Barnard."

At the outset it is well to remember that Barnard's charter declared it was established "for the purposes of affording medical and surgical aid and nursing to persons suffering from skin diseases and cancer and diseases thereto allied; also the study of these diseases and the dissemination of knowledge in regard to them and their treatment"; and that Barnard's Board shall govern its property, funds and affairs and have the management of its medical and business affairs. Those basic facts should be kept constantly in mind.

AS TO THE CLINIC. This clinic contention may well be disposed of here. A "clinic" generally is but a station or institution, usually operated in connection with a medical school or a hospital, and used as

a place to examine and treat out-patients. Examination of Barnard's charter shows that the operation of a free clinic (or any clinic) is not one of the purposes stated therein. Neither the word "clinic", nor any equivalent words are found in the charter. While Barnard is and has been operating a free clinic there is no duty anywhere placed upon its directors to do so, and if it should cease doing so, that would not destroy Barnard's legal entity and functional integrity. Nor will it violate Barnard's charter. And the indigent cancer patient will be benefitted and cancer study and relief will be attained and promoted by an in-patient hospital as well as by an out-patient clinic. Under the affiliation agreement Barnard's class of out-patients, the indigent, will be given out-patient consultation, treatment and care *without a cent of cost* at the University Clinics at the Medical Center. That would take care of Barnard's out-patients if Barnard were *required*·to maintain a clinic. The Chancellor, upon sufficient evidence, correctly ruled this matter in his decree and declaratory judgment. And we affirm his ruling.

 The affiliation contract will not *deprive* Barnard of "surgical and X-ray treatment facilities." Barnard will have the unlimited use, without cost, for its indigent cancer patients, of all the surgical services (including operating rooms and equipment therein) and all X-ray treatment facilities at the Medical Center. Barnard neither will have to invest therein, build nor maintain them, nor annually replace outmoded facilities or X-ray equipment. Any and all of Barnard's patients and Barnard's staff (under the affiliation contract) are to receive that service and the use of that equipment at the Medical Center without charge. The duplication of facilities will be avoided. The expense of such facilities as new modern X-ray equipment and an annual replacement of X-ray equipment will not be incurred by Barnard. The effect upon Barnard's funds and economy needs no demonstration. How that arrangement could adversely affect or "destroy the legal entity and functional integrity of Barnard" is not clarified in appellant's brief.

 Appellant argues that the Medical Center will in fact be absorbing and amalgamating Barnard, but such is not borne out by the record facts. Barnard will remain Barnard, an independent entity and free, as the evidence fully supports and as the Chancellor found. Virginia Mason Hospital Assn. v. Larson, (Wash.) 114 Pac. (2d) 976, 986(12), In re Stark's Will, supra. Its functional integrity will remain unimpaired. Barnard will continue to perform its present functions and render its present services without charge to all indigent cancer patients. The evidence shows and the Chancellor found that Barnard will be immeasurably better located and better equipped to afford complete medical and surgical aid and nursing to the indigent sufferer from cancer and skin diseases than ever before. We agree with the principle announced in Trustees of Andover

Theological Seminary v. Visitors of Theological Institution in Phillips Academy in Andover, (Mass.) 148 N.E. 900, 913, cited and relied on by appellant, that, "those who administer the charity * * * must execute the purpose of the founders conformably to its true intent." And we agree with the Chancellor, but not with appellant, in the analysis of the instant facts. It here appears that Barnard's Board of Directors, under this contract of affiliation, will continue to execute the purpose of the founders and that the proposed affiliation will not depart from the true intent of the founders of the charity. This contract will enable them to *continue* to execute the founders' true intent. The Chancellor correctly ruled this contention. His ruling thereon is affirmed.

 AS TO CLAIMED SURRENDER OF POWERS. It is next contended by appellant that the affiliation contract surrenders the managerial power of Barnard's Board to outside persons over whom the Board has no control. Appellant bases this contention upon his argument that whereas, at the present time Barnard's Board receives and considers the recommendations of a committee of its medical staff as to new members to be appointed to its staff, under the affiliation contract those recommendations for staff membership will come from the Joint Medical Advisory Committee. It is specifically provided in the contract that unless and until approved by Barnard's Board no such appointments to Barnard's staff will be made. Upon both reason and authority Barnard's lay Board of Directors must secure expert professional advice in choosing its staff members. And under the contract there will be no departure from that common sense principle, for it but substitutes one competent group of advisors for another.

Appellant argues Barnard's power in that respect is reduced merely to the veto power. That clearly is not correct. In re Stark's Will, supra. Final and full authority will be in Barnard's Board to name or refuse to name any doctor as one of its staff members. That is not only the clear and unequivocal effect of the documentary exhibits but it is the testimony as well. The parties to this contract have agreed in court that such is its meaning and that such is their intention. Barnard may initiate consideration of and may determine the personnel of its staff, and upon the record in this case the Chancellor could and did find that under the affiliation contract Barnard's Board will have "complete power and control of the professional policies of the Hospital, and of all appointments to, and the government and supervision of the medical staff of the Hospital." With that ruling we agree. See In re Stark's Will, supra.

As a part of appellant's last above stated contention he argues that the contract requires Barnard's Board "to surrender the operation of Barnard * * * to the administrator of Barnes (hospital) over whom (Barnard's) Board has no control". But with that contention we do not agree. Stipulation Exhibit 14 (the contract)

provides: "The (Barnard) Board of Directors retain all jurisdictional powers incident to separate ownership, including the * * * selection of the directing head or the administrator of the hospital *in consultation* with the University." The Chancellor said: "* * * the sole function of the University under this plan is that of consultant. The choice of the administrator is entirely within the control of the Board of Directors of Barnard." It was suggested to the Barnard Board (Stipulation Exhibit 14) that Dr. Frank Bradley, the then administrator of Barnes, McMillan and Maternity Hospitals and Washington University Clinics be named as Barnard's administrator. The Barnard Board considered the matter and approved Doctor Bradley, but, due to the filing of this action no formal appointment was made. The testimony clearly indicates the Barnard Board did not abuse its discretion in approving Doctor Bradley. Any administrator of Barnard must act as such within the overall policies of Barnard's Board. No duties or policies as to the administration of the charity are set out in Barnard's charter. It is only provided therein that the Board shall have that responsibility of administration. In the affiliation of the two hospitals considered by the court in In re Stark's Will, supra, a similar situation was considered by the court and approved. We approve the reasoning and the conclusion there stated. The administrator could not be named by Mr. and Mrs. Barnard, nor can he be named by the courts, nor by the minority directors. Elliott, et al. v. Teachers College, 31 N.Y. Supp. (2d) 796, 803. That administrative matter lies within the discretion of Barnard's Board. The majority of Barnard's Board have indicated their intention. It must of necessity be left under the charter and the contract to the discretion of a majority of the Board.

We have examined the cases cited by appellant: McQuade v. Stoneham, 263 N.Y. 323, 189 N.E. 234, Long-Park, Inc. v. Trenton-New Brunswick Theatres Co., et al., 297 N.Y. 174, 77 N.E. (2d) 633, and others of like character. We agree with the principle stated in those cases that a contract is void which *precludes* a Board of Directors from exercising its prerogative to select or change the officers of a corporation. But appellant misapplies that principle to the instant situation. And the rule of the cited cases it not violated by Barnard agreeing *to consult* with another in exercising its right to appoint Barnard's administrator or medical staff. The Chancellor found the above contentions of appellant to be without merit. We approve his finding.

Appellant next contends that the contract surrenders Barnard's policy making power, and that it deprives Barnard's Board of the control of Barnard's funds. As pointed out above, the Barnard Board, under the contract of affiliation will retain, "all jurisdictional powers incident to separate ownership, including the power to determine the general policy of the institution (Barnard), its fiscal policy,"

1246

etc. That provision fully settles the matter adversely to appellant's contention. As tending to support his contention appellant points to paragraph 6 of the temporary Articles of Affiliation dated March 11, 1948, which were superseded by the contract approved by Barnard's Board on March 14, 1950. That 1950 contract recites that it is "to replace the tentative articles of affiliation approved in 1948." It clearly appears that under the affiliation contract Barnard's Board will retain all of the policy making power originally given that Board in Barnard's charter, and the Chancellor correctly so found. See In re Stark's Will, supra.

 It is also appellant's position here that under the contract Barnard's funds "are resigned to the hotch pot with the funds of other institutions". Appellant's brief takes no issue with those parts of the decree below wherein the Chancellor found and declared that (1) the assumption by others of Barnard's deficit will be a "contribution" to Barnard, and (2) Barnard will retain control of its endowment and its funds designated for research. Appellant bases his instant position upon his argument that the contract provides that "income (endowment, contributions, and other income) of the Barnard Hospital shall be paid into accounts for the operation of Barnard Hospital". Under the contract Barnard's income is to be placed in special accounts solely for Barnard's operation. Barnard's directors will pay Barnard's operating expenses out of those special accounts. Upon the showing of an audit of Barnard's special accounts that a deficit exists in Barnard's funds for its operation expenses, such deficits are to be assumed and paid by the trustees of Barnes Hospital. And for many years such Barnard deficit has annually existed. That deficit has been paid heretofore by contributions from the St. Louis Community Chest and the cancer societies. Barnard's endowments (which have never produced sufficient income to pay Barnard's expenses) are not even mentioned in the contract of affiliation. Under the affiliation contract Barnard's Board will continue to manage Barnard's endowment, receive its income, determine its fiscal policy, and handle its funds.

Upon this point appellant cites Shattuck v. Wood Memorial Home, 319 Mass. 444, 66 N.E. (2d) 568, State ex rel. Pittman v. Adams, supra, The Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, Ray v. Homewood Hospital, 223 Minn. 440, 27 N.W. (2d) 409, 411, and others. All have been carefully examined. Appellant's argument does not consider many of the above facts appearing in this transcript and hereinabove noted, and many of the certain and unambiguous provisions of these documentary exhibits. These contentions were denied by the Chancellor and his decree thereupon must be sustained.

 Assuming the soundness of his ipse dixit that the affiliation contract is ultra vires as to Barnard, appellant next contends that

therefore it was error for the Chancellor to receive evidence as to "modern trends" as to the affiliation of independent specialty hospitals into Medical Centers. The Chancellor received that testimony and limited its admission and consideration to the question of the reasonableness of the action of the majority directors in approving the affiliation. Such testimony did shed light upon whether that action of Barnard's Board was reasonable and prudent, and it was admissible for that purpose. But this contention of appellant was waived by appellant's failure to save and include any such matter in his motion to set aside the decree, which we are considering as filling the office of a motion for new trial. Appellant therefore has no right to have that question reviewed in this court. Supreme Court Rule 3.23 and Handlan v. Handlan, 360 Mo. 1150, 232 S.W. (2d) 944, 946(1). The contention must be denied. In any event, it is without merit.

Appellant also contends the affiliation contract violates the above set out requirements that the services rendered by Barnard must be free; and violates the deeds of gift partially restricting the alienation of the real estate. We have hereinabove discussed whether under the proposed affiliation the services Barnard will render will be free. That they will be free is supported by both the oral and documentary evidence, and was affirmatively found by the Chancellor.

RESTRICTION UPON ALIENATION. The deeds of gift provided that the hospital property could be alienated "if * * * by reason of the changes of conditions surrounding the location of the property", Barnard's directors "shall conclude that the location has become unfavorable for the maintenance of the hospital upon the premises * * * and that it is for the best interests of the institution that the hospital shall be removed from the location above provided for", etc. Appellant contends that Barnard's location could "become unfavorable" only in the event of a change in physical surroundings. The Chancellor correctly ruled the gift deeds are not to be construed to such a limited meaning, and found that the phrase "the location has become unfavorable for the maintenance of a hospital," as used in the deeds of gift "means unfavorably economically as well as physically, comparatively as well as abstractly, as read in the light of the best interests of the beneficiaries of the trust." See Henshaw v. Flenniken, supra, Lackland v. Walker, supra. "Best interests of the institution" as used in the gift deeds clearly includes and means the best interest of the possible beneficiaries of the public trust as well as the institution itself. And we have held that the beneficiaries of a public charity, of necessity an indefinite number of persons, are in effect the real parties in interest and the equitable owners of the fund. State ex rel. Pittman v. Adams, supra. Their best interests must be of paramount consideration. Grantors executed the gift deeds not to create an institution (Barnard) but to create a public charity to serve the beneficiaries of the charity.

While the finding of the Board as reflected in its minutes of March 14, 1950 (Stipulation Exhibit 13) was not in the exact language of the gift deeds, the compliance therewith is substantial, the Board did find in substance what was required of it to be found, and such is the reasonable and necessary inference from its action and the record of its minutes. A strong presumption is raised in favor of the Board's actions. Elliott v. Teachers College, supra, Bradway v. Shattuck, supra. After considering affiliation for many years the Board concluded that the contract to affiliate should be accepted. Their considered study of the problem and their resolution of acceptance of the contract set out in their minutes (and the entire minutes of that meeting) demonstrate that they considered it both reasonable and expedient, and that the present location of the hospital had in fact "become unfavorable", and that it was for the best interests of the institution and the beneficiaries of the charity that the hospital be removed from its present location. Throughout his briefs and in his entire consideration of this case appellant has overlooked or has seemed to take no cognizance of the discretion which the charter vests in Barnard's Board of Directors.

It is well settled that a court of equity will not interfere with or declare void any reasonable exercise of a discretionary power vested solely in the directors of an eleemosynary institution. State ex rel. Heddens et al. v. Rusk, supra, and cases hereinabove cited. Appellant's brief argues at length the pros and cons of Barnard's present location as against the proposed new location within the Medical Center, and cites Lackland v. Walker, supra. We think that case does not support appellant's position. The dominant purpose of the charity is medical and surgical aid and the better treatment of indigent cancer patients, rather than the immediate or geographical proximity of Barnard's present hospital building to the offices of doctors now near the present building. In any event, the merits or demerits of location were settled by the action of Barnard's Board, and the Chancellor refused to interfere with that sound and reasonable exercise of the Board's discretion. We should not interfere under these circumstances. The matter of the merits of location is clearly foreclosed because the Board did not abuse its discretion. Upon the evidence the Chancellor was justified in concluding that Barnard would be a better instrumentality of service to the indigent it can (and must) serve if it were affiliated at the Medical Center. Under the proposed affiliation Barnard will be relieved of the pressure of the daily need to some place find the funds to meet its payrolls and daily operating expenses. Its staff will be able to devote itself exclusively to the charity's purposes of affording aid to indigent cancer patients.

Under these circumstances must a court of equity, with a cold, inflexible and unreasoning adherence to mere terminology, rule that

for mere omission of the Board to word its minutes in a certain phraseology, ▆▆▆ *and none other*, that such minutes may be held deficient, or that the Board's discretion was abused, or that its action in that behalf be held void? We think not. Courts of equity take no account of mere inaccuracies of expression or inappropriate choice of words. Equity pierces the form and takes cognizance of substance. Equity has inherent power under the instant circumstances to authorize the Board to sell the present Barnard property. Henshaw v. Flenniken, supra. The provisions of the gift deeds respecting alienation are not here so vital that equity may not separate the dominant purpose of this charity and the need for its continued existence, from its further operation at its present location. For reasons above appearing and clearly not foreseeable by Mr. Barnard the continued use of the present hospital site and building will economically cripple and impair the declared purposes and usefulness of Barnard as a public charity, and, the sale of the present property and the construction and operation of the new Barnard within the Medical Center will enable the Board to continue to carry out Barnard's purposes and the true intention of Mr. Barnard in making the deeds of gift. Henshaw v. Flenniken, supra, and other authorities cited above.

We are not unmindful that able counsel for appellant have cited in their briefs, upon the legal propositions they advance therein, many decisions and texts which they conceive to be at variance with our above conclusions.. Those decisions and texts have been given full consideration. The already unfortunate length of this opinion forbids individual analysis of those cited cases and texts.

▆▆▆ The principal issue in this case, in the lower court and here, has been whether under the contract now before us the proposed affiliation will constitute a substantial departure from Barnard's charter purposes of "affording medical and surgical aid to persons suffering from skin diseases and cancer, and diseases thereto allied." We conclude that such proposed affiliation will not depart from Barnard's charter purpose. That issue must be kept separate and apart from appellant's collateral discussion involving only the *means* of accomplishing those charter purposes. The *means of accomplishing* those purposes do not appear in the charter; and it is not there required that those purposes be accomplished by a "self-contained" hospital, complete within itself. We find no requirement that Barnard must continue to operate in the exact manner it has heretofore been operated. We find neither limitations nor restrictions nor inference which prevent the Board from accommodating its administration of this charity to changed conditions as the decades come and go, *so long as the Board continues to operate it for the dominant object and purpose stated in its charter*. The record reflects that Barnard does not receive from the Barnard trust the sum which Mr. Barnard apparently felt it would always receive. Events he could not fore-

1250

see four decades ago have markedly diminished Barnard's income. In 1910 Barnard's average cost per patient per day was $1.46. Increased operation costs, plant obsolescence, inflation, and many other factors apparently not reasonably to be anticipated 42 years ago have raised new questions in Barnard's economy, and have presented new and increasingly important problems to Barnard's Board. The entire record demonstrates the wisdom of the discretion vested by the charter in the Barnard Board.

Our conclusions and disposition of this case have not required any application of the principles of the cy pres doctrine. The differences between the parties to this action actually concern only the administrative details of the operation of the charity. It appears from this record that the proposed affiliation presents a workable plan which will prove to be of infinite value to indigent humanity afflicted with cancer, skin and allied diseases; and that under the proposed affiliation such result will be attained in full conformity with and within Barnard's charter powers and the provisions of the above mentioned deeds of gift and wills.

 AS TO THE TRUSTEES. The Chancellor's decree exonerated the trustees of the charges of misconduct alleged in the petition, and declared that they could not terminate the payments from the trust to Barnard. In his reply brief, the appellant states that he "does not wish to pursue his prayer for the removal of the defendant trustees, the good faith of whom has never been drawn in issue".

In their separate brief the trustees assert they "would not be justified in refusing to pay the income of the testamentary trust to Barnard even if it becomes necessary for Barnard to make a charge against those patients able to pay", because the trustees have no duty to see that Barnard is maintained as a free hospital. The trustees request and insist that this Court should rule that contention "for the guidance of the trustees". There are many reasons why we should not here rule that question. We mention two of them briefly.

The pleadings presented no such issue to the Chancellor below. Nor was there any evidence upon it. In their separate answer the trustees did not pray for any instructions as to what their duty might be in such supposed hypothetical instance. And there was no evidence of any intention to operate Barnard as a pay hospital. The evidence was all to the effect that it was the intention of its directors to continue to operate Barnard as a free hospital. In and of themselves the above sufficiently preclude any present expression of our view upon the above request of the trustees as made in their brief. Should the question ever become a live one (and it appears from this record that it will not) it will then be time enough for the trustees to request directions from the circuit court in the proper manner.

We rule that upon the record before him the Chancellor correctly found and declared that the affiliation contract "is not violative of the dominant object and purpose expressed in the Articles of Agreement of The Barnard Free Skin and Cancer Hospital, Barnard Agreement and Deeds of Gift, and Barnard Wills, but is in harmony and accord with such purpose and object (and that such agreement) * *. * continues to vest full and complete powers of ownership, management, government, control and operation of the property, funds and affairs of The Barnard Free Skin and Cancer Hospital in its Board of Directors." We further rule that upon the record the Chancellor further correctly found and declared that: "The determination upon the proposed affiliation of The Barnard Free Skin and Cancer Hospital with Washington University is within the powers of the Board of Directors of The Barnard Free Skin and Cancer Hospital, and the action of said Board entering into said agreement to affiliate is within the Board's said powers and authority, and the Board's action is proper and is approved".

From our examination of the record we find that the acceptance of the affiliation contract was a reasonable exercise of the Board's discretionary powers, that the proposed affiliation is reasonable, that all of the Chancellor's findings are supported by the evidence, and that his decrees and declarations must be and are in all respects affirmed. It is so ordered. All concur.