Johnson Fare Box Company, Respondent, (Plaintiff) v. The C. L Downey Company, Appellant, (Defendant) and C. Lee Downey, L. Craig Jackson and Ann Dorsey Hodgdon, Appellants, (Intervenors), No. 43518—263 S. W. (2d) 413.

Division Two, December 14, 1953.

Motion for Rehearing or to Transfer to Banc Overruled, January 11, 1954.

*Carstarphen & Harvey* and *Rendlen & Rendlen* for appellants.

*Fuller, Ely & Hibbard* for respondent.

524

BARRETT, C.—This suit originated when the Johnson Fare Box Company sued C. L. Downey Company on two demand notes, one for $12,000, dated December 16th, 1946, and the other for $25,500, dated March 15th, 1950.

The Johnson Fare Box Company is a Delaware corporation. That corporation, together with sixteen other companies, is a wholly owned or controlled subsidiary of Bowser, Incorporated, and they are all engaged in related manufacturing, selling and financing enterprises. Mr. R. Hoskin Damon, a Chicago lawyer, either through stock ownership or finances, dominates and, for the purposes of this opinion, controls all the corporations. The C. L. Downey Company is an Ohio corporation, owned and dominated by Mr. C. L. Downey until his death on March 3, 1953, during the pendency of this appeal. Mr. Downey was an inventor and manufacturer of coin counting and coin wrapping machines, and in 1917 organized the C. L. Downey Company. In 1941 the C. L. Downey Company moved its manufacturing plant and offices from Cincinnati to Hannibal. (C. L. Downey Company v. Commissioner of Internal Revenue, 172 F. (2) 810.)

In response to the suit on the notes the C. L. Downey Company filed an answer and two counterclaims. In addition, Mr. Downey and his adopted daughter, Mrs. L. Craig Jackson, and another individual filed an intervening petition in which they personally sought to set aside a transaction with Mr. Damon and the transfer of the common

stock of C. L. Downey Company to Johnson Fare Box Company. In substance, the answers set up that the notes were "not due" and that Johnson Fare Box Company was not entitled to demand payment for the reason that "pursuant to an agreement" on the 16th day of November 1945 "and on numerous other occasions," in consideration of the transfer of all the common stock of C. L. Downey Company, Johnson Fare Box Company and Bowser, Incorporated, (assignor of the $12,000 note), agreed to loan the Downey Company such amounts of money as would be required from time to time to finance its business and "not demand repayment of any amount of money so loaned at any time when such amount of money was required for use by defendant in the operation of defendant's business" and that the sums represented by the notes were so loaned and are now "required for use in the operation of defendant's business." For this reason the C. L. Downey Company asked that the suit on the notes be dismissed. For its first counterclaim the Downey Company stated that at the special instance and request of the plaintiff the Downey Company had rendered valuable services in connection with the sale of forty-three coin counting machines to the Federal Reserve banks at $10,000 a machine for which there was a commission due of $43,000. For its second counterclaim the Downey Company alleged that on the 16th day of November 1945, and "on numerous other occasions" the Johnson Fare Box Company, in consideration of the transfer of all the common stock of Downey Company, agreed to transfer to Downey Company all its machinery and business in connection with its paper wrapper products but had failed to do so and that for the breach of the agreement Downey Company was entitled to $82,500 damages. In the intervening petition the individuals set forth the fact that prior to January 1946 they had owned all the common stock of the C. L. Downey Company and were thereby the owners of all possible beneficial interests of the company and that Mr. Damon, as a lawyer, rendered legal services to "Intervenors with respect to the stock of defendant owned by Intervenors, estate planning, estate taxes and income taxes," that they relied upon Mr. Damon but he breached his duty to them as a lawyer and caused the transfer of all the shares of common stock and the issuance to them as a stock dividend of 1500 shares of preferred stock, all of which was of no benefit to them and that they "were unaware of the true nature of said transfer" until January 1951. In this connection the intervenors alleged that Mr. Damon promised that Bowser, Incorporated, would loan Downey Company such sums of money as would be needed to finance its business and not demand payment as long as needed and because of the fiduciary relationship of the parties intervenors agreed to and did transfer their common stock to Johnson Fare Box Company. As a further inducement to the transfer of the stock and in breach of their fiduciary relationship the intervenors alleged that Mr. Damon prom-

ised that the paper wrapper business of Johnson Fare Box Company would be transferred to C. L. Downey Company. Because of all these matters the individual intervenors asked to have the transfer of the common stock set aside and that they be declared the owners; 288 shares to Mr. Downey; 11 shares to Mrs. Jackson and 1 share to Ann Dorsey Hodgdon.

The trial court found all the issues on these various claims against the corporate defendant and the individual intervenors and in favor of the plaintiff, Johnson Fare Box Company. Specifically, the trial court found that Johnson Fare Box Company was entitled to recover on the two notes, with interest at 3 $\frac{7}{8}\%$ from July 15th, 1951, and that there was "no substantial evidence of any promise, understanding, agreement, contract or representation" that payment of the notes would not be demanded as long as the amounts were needed in the defendant's business. Likewise, as to the first counterclaim for a commission on sales to the Federal Reserve banks, the court found that there was no promise, agreement or contract, either express or implied, to pay a commission on such sales. As to the second counterclaim for damages for failure to transfer the paper division to Downey Company the court found that there was no evidence of an enforceable agreement or contract to make such a transfer. Upon the intervening petition, the court found that "there was no confidential relationship existing between or among the parties, and even if there had been such a relationship the evidence clearly shows there was no fraud, deceit, misrepresentation or overreaching but that the transaction was fair and legitimate and the consideration given for the transfer of the common stock was fair and adequate." The C. L. Downey Company and the individual intervenors have appealed from the decree and judgment entered upon the court's finding of fact.

By way of introduction it may be noted that while Mr. Damon is a lawyer and maintains a law firm in Chicago, he is in fact a "lawyer-businessman," interested in financing, promoting and consolidating manufacturing corporations engaged in somewhat similar lines of business. Mr. Downey was an inventor, manufacturer and distributor of coin counting and coin wrapping machines, a veritable pioneer in the industry. The business of C. L. Downey Company is related to that of several of Mr. Damon's companies, in some respects they were competitors. Mr. Downey and Mr. Damon first met at stationers' conventions in 1931. Their casual acquaintance developed into some business dealings and finally into a rather active social relationship. Mr. Downey first sold Johnson Fare Box Company several hundred coin counting machines and in 1937, through Mr. Damon, Mr. Downey sold Johnson Fare Box Company a whole division of its business. Mr. Downey was an elderly gentleman, eighty years of age at the time of this trial, and Mr. Damon is a middle-aged man. Both of these gentle-

men were indeed experienced in corporate management and were astute corporate financiers.

Throughout the years Mr. Damon and Mr. Downey discussed the mutual problems of their related companies, particularly the manufacture and distribution of coin counting and coin wrapping machines and the paper wrapping business. In July 1945 Mr. Damon wrote Mr. Downey and informed him that Bowser had acquired the stock of Johnson Fare Box Company in exchange for Bowser common stock. Mr. Downey owned 1.8 shares of Johnson preferred and Mr. Damon offered him 27 shares of Bowser common stock for his 1.8 shares of Johnson preferred. Mr. Downey could see no advantage in the stock exchange but offered to do so if Mr. Damon would, guarantee an immediate market of the Bowser stock at $8.00 a share. This correspondence resulted in Mr. Damon's paying Mr. Downey $200 for his stock. In Mr. Damon's first letter he expressed the wish to see Mr. Downey and said ''possibly we can get together on some sort of a mutually advantageous deal. I understand your busines is going along very nicely and subject only to limitations of materials, you could do far more business than you are doing at the present time.'' In Mr. Downey's letter it appears that they had previously discussed the possibility of Mr. Damon's acquisition of Downey's paper business. He said, ''The writer is presuming that with the transfer of the Johnson Fare Box Business to Bowser you will have practically lost your interest in the paper products items, as negotiation undertaken when you sent Mr. Burt and Mr. Lloyd was not followed up, but on the contrary after we opened up our books for inspection and disclosed to these gentlemen our operation, you almost immediately purchased the Klopp business, and you may appreciate this did not look so very good to the writer.'' In reply, on August 2nd, 1945, Mr. Damon explained his acquisition of the Klopp company (these gentlemen wrote volumes of letters) and said, ''I am still interested in C. L. Downey & Company on some basis which would anticipate the original pay-out. However, that did not seem possible. * * * Sooner or later I expect we will do business concerning your company, and I am anxious to keep that contact with you in order that it may be developed at some future date. The main difficulty is getting together on a price and method of payment, and that might be difficult.''

On November 2nd, 1945, Johnson Fare Box Company, through Mr. Damon, made a definite proposal to purchase the 300 shares of the capital common stock of C. L. Downey Company for $4500. That offer was amended on November 5th, apparently in response to Mr. Downey's suggestion or objection to the number of directors and Mr. Downey's control of their election. In substance, Johnson Fare Box Company's purchase of the 300 shares of common stock was conditional upon Downey Company's cancelling its outstanding preferred stock, its charter was to be amended and 1500 shares of preferred stock

"entitled to cumulative dividends at the rate of $4.00 per share, preference in liquidation at $100 per share" were to be issued to the then owners of the common stock as a stock dividend. Mr. Downey was to be employed as president of the company for a term of five years at a salary of $300 a week, and Mrs. Jackson was to be employed for five years at a salary of $600 a month. As long as Mr. Downey and Mrs. Jackson owned 1000 shares of the preferred stock Johnson Fare Box Company agreed to vote the common stock for three directors (there were to be five) nominated by them. There was further correspondence and personal interviews as to details of execution, but the proposal by Mr. Damon was accepted and, in general terms, carried out by the parties.

Prior to the purchase of the common stock, or "option to purchase" as Mr. Damon called the $150,000 arrangement as to the preferred stock, or, the "affiliation with the Bowser group," as Mr. Downey called it, the C. L. Downey Company had financed its operations through a bank in Covington, Kentucky. The Kentucky bank made loans to the C. L. Downey Company upon Mr. Downey's personal endorsement of the company's notes. The first of these notes, an $8000 note and a $4000 note, were due in December 1945. Concerning these two notes Mr. Downey wrote Mr. Damon on December 6th, 1945: "According to our arrangement, the Johnson Fare Box Company is to take up these notes *by such plan of financing as you wish to carry out * * *.*" On June 10th, 1946 Mr. Downey wrote the treasurer of Bowser, Incorporated, concerning the Downey Company's indebtedness, then totalling $38,500. He complained of the bank's interest rate of 4 ½% and discussed the need for further credit due to the paper shortage. Among other things, he said, "Now that the Bowser preferred stock has been marketed, it is the writer's understanding that you will take over the financing of our business, *permitting the writer to be released from his personal obligation* with The First National Bank & Trust Company of Covington, Kentucky, because our plan there is to issue notes payable to the writer who endorses these notes and discounts them at the bank for the credit of the company, which, of course, makes the writer personally liable for the entire claim." Whatever arrangement Mr. Downey and Mr. Damon may have made as to the financing of C. L. Downey Company, Bowser, Incorporated, and Johnson Fare Box Company advanced the sums represented by the notes involved in this suit, the $25,500 note and the $12,000 note, to take up the Downey Company's indebtedness to the Covington bank.

As previously stated, the trial court found, contrary to the Downey Company's answer to the suit on the notes and contrary to the intervenors' individual claims, that·there was no substantial evidence of any agreement, promise or representation by anyone that either Bowser or Johnson Fare Box Company would loan Downey

Company such unlimited sums as would be needed in its business or that payment of the notes would not be demanded as long as the company needed the finances. In this connection it is not necessary to say whether all the agreements of the parties were integrated in either a single contract or a series of contracts and writings. For the purposes of this opinion it may be assumed that they were not and that therefore the parol evidence rule was inapplicable. So considered, Mr. Downey says that Mr. Damon promised that his companies would take over their finances, advance such sums as would be necessary to finance the Downey Company and not demand payment as long as the money was needed in the business. Mr. Damon said, "In connection with acquiring stock of subsidiaries, I told him this. That it was necessary that the banking be done out of one common pot, having seventeen subsidiaries, it was not practicable for each to have their various bank accounts, that I thought we could lend him help in that end by coming in under the common banking pool so we would be his bankers instead of a commercial bank and we would handle it the same way as any other bank would handle it. I told him that was the procedure in connection with our subsidiaries, but in order to do that, and also in order to give him benefit of filing a consolidated tax return with our company, that we would have to be in control—own all the voting stock of the corporation." He said, "What I did tell Mr. Downey was that we handled our bank loans through the parent company. We borrowed from a group of banks when we needed money, through the parent company, * * * so we put him in what we call our banking pool. The procedure is for the parent company to borrow money and in turn, lend it to the subsidiaries, and in turn, we become their banker in a sense. We become their banker just like a commercial banker. We take current notes from them. We have definite maturities, if they don't pay them, either pay them or liquidate the company. There is no difference between our position as a bank in that financing sense, than there is in any other commercial bank. *We didn't suggest to Mr. Downey that we were going to finance him as he required*, or anything else because I didn't have that power under the Board, to give a carte blanche financing to anyone. Q. *You said you would take over and handle his bank loans, is that correct?* A. *Yes, that's right.*"

Bowser and Johnson Fare Box Company did take over the Downey Company's bank loans and by so doing the interest rate was reduced from 4 ½% to 3 ⅞% and Mr. Downey was relieved of his personal liability on the Covington bank notes. There may have been no advantage in it but Downey Company was included in Bowser's consolidated income tax returns for the years 1946, 1947, 1948, 1949 and 1950, and paid no part of the tax. Their financial arrangements culminated in 1947 when the Downey Company plant was damaged in a flash flood and Mr. Downey requested additional finances of $25,000. A further detailed analysis of their financial dealings would serve no

useful purpose, it is sufficient to note that the answer to the precise question of the existence of a promise or agreement for unlimited financing as long as needed is dependent upon the acceptance of the conflicting oral testimony of either Mr. Damon or Mr. Downey, in short upon a finding as to credibility. There is some corroboration in the circumstances for Mr. Damon's version of the arrangement, and the trial court has, of necessity, resolved any question dependent upon credibility against the appellants. While the record upon this appeal is reviewed anew "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." V.A.M.S., Sec. 510.310(4). So considering the record anew, it may not be said that the evidence is insufficient to sustain the findings of the trial court, or that the weight and preponderance of the appellants' evidence is of such probative force that the trial court should have found the issues in their favor, or that this court could appropriately enter some other judgment. Taylor v. Baldwin, 362 Mo. 1224, 247 S. W. (2) 741, 751; Milgram v. Jiffy Equipment Co., 362 Mo. 1194, 247 S. W. (2) 668. It follows that the trial court did not err in entering judgment for the plaintiff on the notes or in finding that there was no agreement for unlimited finances or a promise that there would be no demand for payment of obligations as long as needed.

 It is possible that what we have said concerning the defense to the suit on the notes is sufficient to dispose of the two counterclaims and the other inducement set forth in the intervening petition, that Johnson Fare Box Company was to transfer its paper wrapping business to the C. L. Downey Company. Nevertheless, in reviewing the record anew, these questions are briefly noted. What we have said concerning the answer and the promise to lend money is peculiarly applicable to the claim for damages and the intervenors' claim that part of the consideration for the transfer of the common stock was a promise that Johnson Fare Box Company would transfer its paper business. In answer to interrogatories the appellants admitted that there was no written agreement for the transfer of the paper business and there was no written demand by the appellants that such a transfer be made. Mr. Downey testified that Mr. Damon made the promise, and Mr. Damon denied it. The subject was discussed in their voluminous correspondence and there is corroboration in Mr. Downey's letters for the court's finding. In their early correspondence, during the negotiations and the "affiliation," there was no mention of this important matter. The affiliation was consummated in 1945 and 1946. In June 1949 Mr. Downey wrote to Mr. Damon about a visit from Damon's brother and their discussion of "the situation in regard to our Chicago dealers who had complained about competition from Johnson Fare Box Company." Among other things, Mr. Downey said, "he also repeated what had been discussed last February in reference to the type of business which the Johnson wrapper depart-

ment should select actively, and which should not conflict with our dealer plan of distribution.'' On April 3rd, 1950, in a five page letter, he said, ''The writer does not know the amount you pay on the lease for the quarters where the paper division is now installed, but if you can get a building at lesser cost, having eight·to ten thousand square feet of storage space, and would operate a warehouse only in Chicago, *turning the manufacturing of the paper division over to us*, we believe that you could eliminate the losses there, which seem to have been quite heavy last year.'' The following day, in a six page letter, he wrote about the possibility of selling certain machines and said, ''if an order can be secured from the Federal Reserve Banks for at least fifty of the machines, *the writer feels it would be logical and wise to transfer the paper goods division of Johnson Fare Box Company to Hannibal,* * * *.''* Mr. Damon said that he had discussed the transfer of the paper division with Mr. Downey in 1948 and again in 1951, ''I said, however, it must be done on paper, we are not going to transfer any assets until we have control.'' In 1951 he made Mr. Downey a proposition for the transfer and Mr. Downey turned it down. The trial court's finding ''on this issue that there is no evidence to show an enforceable agreement or contract to make such a transfer,'' may not be disturbed in these circumstances. Taylor v. Baldwin, supra.

It is not necessary to detail the facts concerning the counterclaim for a $43,000 commission for sales of coin counting machines. Mr. Downey did attend certain Federal Reserve bank committee meetings and demonstrate machines, and both Mr. Damon and Johnson Fare Box Company requested his presence at these meetings. But there is no substantial evidence that there was either an express or an implied promise to compensate the C. L. Downey Company for Mr. Downey's services. It was to their mutual benefit that he attend the committee meetings. Mr. Downey was the inventor of and had applied for the key patents to the machines which Johnson Fare Box Company manufactured and sold. On July 10th, 1950, Mr. Downey, personally, and Johnson Fare Box Company entered into a written contract by which Mr. Downey transferred his patents to Johnson Fare Box Company. Among other things the contract provided that ''The undersigned Johnson Fare Box Company, hereby agrees that it will pay to Clement Lee Downey $200.00 (two hundred dollars) per machine, covered by the aforesaid patent rights and patent·applications when, as, and if, said automatic coin counting and handling machines or devises are manufactured, sold, and paid for.'' In its finding of fact the trial court appropriately noted the following from Mr. Downey's cross-examination as to this claim: ''Q. At any time while you were in Chicago, did you state to Mr. Damon, or to any representative of Bowser, or of Johnson Fare Box Company that the C. L. Downey Company intended to claim a commission of $1000.00

a machine? A. I don't think so. * * * Q. You say you think a demand followed this contract? A. Yes. * * * By Mr. White: * * * Mr. Downey, isn't it a fact that no claim was ever made for any commission whatsoever by The C. L. Downey Company to anyone connected with Johnson or with Bowser until the counterclaim was filed in this lawsuit? A. I wouldn't say that is exactly true but it is approximately true, because after all when I found I was getting no royalty, no move of the machines, we made a demand then for compensation because the Company was out several thousand dollars paying for these expenses in Chicago. * * * Q. Was any promise made either orally or in writing by Johnson Fare Box Company, or Bowser, Inc., or any officer or representative of those companies, to pay The C. L. Downey Company a commission in connection with the sale of these machines? A. I don't think so, no, not then, when * * *." The quotations demonstrate the evidentiary basis for the court's finding on this issue and repel the inference, in the circumstances, of either an express or an implied promise to pay for the services. Abresch v. Schultz, (Mo. App.) 216 S. W. (2) 134, 139; Strother v. De Witt, 98 Mo. App. 293, 298, 71 S. W. 1129; Restatement, Restitution, p. 13; Sec. 107 (2), p. 448; Restatement, Agency, Sec. 441, p. 1027. The trial court appropriately found the issues on the two counterclaims and that the subject matter of the counterclaims was not an inducement or part of the consideration for the intervenors' transfer of the common stock against the appellants.

In the intervening petition it is claimed that Mr. Damon and his law firm represented Mr. Downey and his adopted daughter, personally, and since he represented and dominated Bowser, Incorporated, and Johnson Fare Box Company that he and his law firm violated their duty and obligations as lawyers and therefore the transfer of the 300 shares of common stock to Johnson Fare Box should be set aside. Bybee v. S'Renco, 316 Mo. 517, 291 S. W. 459; Gardine v. Cottey, 360 Mo. 681, 230 S. W. (2) 731; 7 C. J. S., Sec. 128, p. 970. It is urged, if the law firm did not represent them, that Mr. Damon was their confidential and business advisor, that there was a fiduciary relationship, and that the transfer of the stock was induced and procured in violation of their especially reposed confidence and should be set aside for that reason. Hockenberry v. Cooper County State Bank, 338 Mo. 31, 43, 88 S. W. (2) 1031; Hamilton v. Armstrong, 120 Mo. 597, 25 S. W. 545; Restatement, Restitution, Sec. 190. Mr. Downey testified that Mr. Damon advised him and that the purpose of the transfer of the common stock and the issuance of the 1500 shares of preferred stock had to do with his "estate planning" and income taxes. And, in one of his early letters in which he stated that he was still interested in C. L. Downey Company on some basis, Mr. Damon did say, "In the meantime, I would certainly urge you to get your affairs in shape so your estate would not suffer. I

can point out ways of doing that at the present time, which would make a deal in the future more acceptable to you and to ourselves at the same time, and ▓▓▓ protect you to a very great extent in your estate matters." Mr. Damon admits that he gave Mr. Downey certain advise, some of it in error, but he denies that he was in fact his lawyer as to his will or estate and in this he is corroborated by the circumstances. Despite their intimate acquaintance, Mr. Damon was not aware of Mr. Downey's marital status and did not know that he had a wife. Neither Mr. Damon nor any member of his firm drafted a will or any other document concerning Mr. Downey's personal estate and Mr. Downey did not testify that they had. There were no written opinions upon any strictly personal matters and, while not conclusive, there were no personal fees charged or paid. Demmel v. Hammett, 360 Mo. 737, 230 S. W. (2) 686. In short, there is no substantial, probative evidence that Mr. Damon or the members of his firm represented Mr. Downey personally in connection with his estate.

In the consummation of the "affiliation" Mr. Damon and his firm did draft and prepare many corporate documents and contracts and, unwillingly or not, as often happens sometimes acted in a dual capacity. It is not necessary, however, to say whether they represented Mr. Downey and Mrs. Jackson in their capacity as lawyers in the "affiliation," it is assumed for the purposes of this opinion that there was an obligation and duty on their part to Mr. Downey and Mrs. Jackson, a fiduciary relationship (36 C. J. S., p. 741), but it does not follow that the relationship was violated and that the transfer of the common stock must be set aside for that reason. Kirschner v. Kirschner, 113 Mo. 290, 20 S. W. 791. Upon this issue the trial court found that "there was no confidential relationship existing between or among the parties, and even if there had been such a relationship the evidence clearly shows there was no fraud, deceit, misrepresentation or overreaching but that the transaction was fair and legitimate and the consideration given for the transfer of the common stock was fair and adequate." Assuming some doubt as to the complete validity of the court's finding as to the nature of the relationship, there can be no question or doubt as to the finding and conclusion that the intervenors, nevertheless, are not entitled to have the stock transfer set aside.

The parties to this transaction understood one another and the business in hand fully and completely. As the court found, the negotiations resulting in the transfer of the stock extended over a long period of time and the details were thoroughly discussed and carefully considered, orally and in voluminous, detailed correspondence and Mr. Downey had full understanding of every phase of it, including all the hazards to him and his control of the company. Mr. Damon's firm prepared many of the documents but when there was any doubt upon any question Mr. Downey sought and obtained competent, independent advice and enforced his own views. For example,

534

one of his principal concerns was his retention of control of the C. L. Downey Company after the transfer of the common stock. Accordingly the Damon firm changed the original proposal and provided that as long as Mr. Downey and Mrs. Jackson owned 1000 or more shares of preferred stock Johnson Fare Box Company would vote the common stock in favor of three directors out of five nominated by the holders of the preferred stock. After this change in the proposal Mr. Downey consulted a Hannibal lawyer and the arrangement was further changed, in accordance with the lawyer's advice, to provide that the holders of the common stock could not increase the number of directors or change the capital stock structure except by a two-thirds vote of the holders of the preferred stock. As a further safeguard the local lawyer suggested that the common stock certificates be stamped with a notation that they were subject to a contract as to voting between the holders and Mrs. Jackson and Mr. Downey. Mr. Downey suggested and made changes in his own lawyer's written proposal on this subject. As to certain corporate matters he consulted a lawyer in Cincinnati. He explained the details and effect of the transaction to one of the Kentucky bankers and expressed complete satisfaction ▮▮▮ with it. When there was any doubt as to income tax liability as to the preferred stock he consulted a local accountant. The "affiliation" turned out to be an unhappy and unfortunate arrangement but it was negotiated and consummated in full and complete understanding on all sides, including appreciation of the hazards, and not as the result of the breach of any fiduciary or lawyer-client relationship. Kirschner v. Kirschner, supra; Restatement, Restitution, Sec. 191; 5 Am. Jur., Sec. 48, p. 287. It is not possible for this court, upon this record, to find the issues other than as the trial court found them (Taylor v. Baldwin, supra), accordingly the judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.