Gladys HEMPHILL (Plaintiff) and William Crouch (Intervenor), Appellants,

v.

L. Craig JACKSON, Administratrix of the Estate of C. Lee Downey, Deceased (Defendant), Respondent.

No. 29960.

St. Louis Court of Appeals.

Missouri.

Nov. 5, 1957.

Rehearing Denied Dec. 2, 1957.

Tilford & Dobbins, Stuart Alexander, Louisville, Fuller, Ely & Hibbard, Hannibal, for appellants.

Carstarphen & Harvey, Rendlen & Rendlen, Hannibal, for respondent.

WOLFE, Commissioner.

This action, which is a proceeding for the discovery of assets, originated in the Probate Court of Marion County and from a judgment there for the defendant administratrix, the plaintiffs appealed to the Hannibal Court of Common Pleas. Upon trial in the court of common pleas there was again a judgment for the defendant and the plaintiffs appealed to the Supreme Court. The Supreme Court transferred the case to this court for the reason that the record failed to reveal that the amount in controversy brought the appeal within its jurisdiction. Hemphill v. Jackson, Mo. Sup., 304 S.W.2d 7.

C. Lee Downey died intestate in Marion County, Missouri, on March 9, 1953, and L. Craig Jackson was appointed administratrix of his estate on April 14, 1953. Thereafter Gladys Hemphill brought this proceeding to discover assets, contending that the administratrix, L. Craig Jackson, had failed to inventory as an asset of the estate 1440 shares of C. L. Downey Company, an Ohio corporation. The plaintiff Gladys Hemphill claimed to be a cousin of C. Lee Downey, deceased, and averred that she was next of kin in that no one nearer in the line of intestate succession was living except one who had renounced all claim to the estate. Another alleged cousin named William L. Crouch intervened and joined the plaintiff in her effort to have the corporate stock inventoried as an asset of the estate. The administratrix, L. Craig Jackson, claimed to be the adopted daughter of C. Lee Downey. She also claimed that she had a survivor's title to the 1440 shares of stock of the C. L. Downey Company, stating that the certificates were all issued to "C. Lee Downey or Mrs. L. Craig Jackson". She denied that Gladys Hemphill and Crouch were related to the deceased, C. Lee Downey.

The issues presented raised a question, preliminary in nature, as to whether or not Gladys Hemphill and William L. Crouch were proper parties plaintiff. The statute provides that a proceeding to discover assets may be brought by any interested person. § 462.440, RSMo 1949, § 473.353, R.S. 1949, as amended in 1955, V.A.M.S. If L. Craig Jackson was in fact the adopted daughter of C. Lee Downey, she would have inherited from him as his natural child. § 453.090 RSMo 1949, V.A.M.S.; Kindred v. Anderson, 357 Mo. 564, 209 S. W.2d 912. In that event a cousin of the deceased would take nothing under the law of intestate succession as provided by Section 468.010 RSMo 1949, V.A.M.S., Section 474.010 RSMo 1949, as amended in 1955, V.A.M.S., and consequently Gladys Hemphill and Crouch, even though cousins, would not be interested persons. It is, of course, quite evident that if the plaintiffs are not in fact cousins of the deceased they are not interested persons no matter what the status of L. Craig Jackson may be. Thus a finding on either of these issues in favor of the defendant administratrix would leave the plaintiffs without any right to maintain this action.

In view of the foregoing, the question of Mrs. L. Craig Jackson's relation to the deceased, C. Lee Downey, will be first considered. She was by birth a cousin once

removed of C. Lee Downey, being a granddaughter of Downey's maternal aunt. Mrs. Jackson's maiden name was Lucille Craig and she and her family were very close friends of C. Lee Downey. Her sister was named after him and the Craigs called him Uncle Lee. As a girl Mrs. Jackson went from her home in Sparta, Kentucky, to work for C. Lee Downey and lived at Downey's father's home. His father was John J. Downey and a favorite relative of Mrs. Jackson. After working in Cincinnati for a short time, she went to New York and in a course of time became what is termed "a stylist", which entailed the selection and recommendation of suitable wardrobes for women. She successfully established herself in this business in New York and it was there that she met and married Dr. John Jackson. Mrs. Jackson had a number of theatrical persons as clients in New York and in 1929, when a great many of the stars of the New York stage went into motion pictures in California, Mrs. Jackson and her husband, whom she had just married, moved to Hollywood. There she again established herself as a stylist.

In 1937, C. Lee Downey went to California. He and his wife were separated and she had by a separation agreement waived any interest that she had or might have in his property or estate. The Downeys had no children. While in California C. Lee Downey talked to Mrs. Jackson and sought to prevail upon her to return to Cincinnati and enter his business. She later did this with the understanding that the business was to be hers upon Downey's death. Mrs. Jackson, whose husband had died, returned to Cincinnati and went into the C. L. Downey Company. From then on she took over an active part in its operation and management. Downey said that he had adopted her as his daughter. He talked to her father about the adoption and displayed a paper said to relate to it. Downey and Mrs. Jackson thereafter lived together and he introduced her as his daughter on many occasions to numerous people, who so testified.

There was evidence that the purported adoption took place in Cincinnati, Ohio. The chief deputy of the Probate Court of Hamilton County, Ohio, which is the county in which Cincinnati is located, testified that he had examined the records of the court and that there was no record of any adoption of Mrs. L. Craig Jackson by C. Lee Downey. He also testified that there was no record of C. Lee Downey having filed with the court a designation of Mrs. Jackson as his heir as he could have done under the statutes

The adoption, if it took place, took place in Ohio. It was there that the agreement to adopt was consummated and it was there that the administratrix claims that the adoption took place. The laws of Ohio consequently govern. 2 C.J.S. Adoption of Children § 3, p. 371. At the time it was alleged to have taken place L. Craig Jackson was an adult and the laws of Ohio had no provision for the adoption of adults. Section 10512–9, Page's Ohio General Code 1946, which was the law in effect at the time, provided only for the adoption of minor children. There was but one way that this could be done and that was by a proceeding in the probate court. Section 10503–12, Page's Ohio General Code 1946, contained a provision whereby an adult could be designated as an heir by the party making the designation filing a written instrument in the probate court so stating, but there was no record in the court of such a designation ever having been filed. It consequently follows that there was no statutory adoption of any nature. Nor can we, as the respondent suggests, follow the Missouri cases relating to equitable adoption. As stated before, the Ohio law prevails in this case; but even if the Missouri law did prevail, it would not aid the defendant, for the doctrine of equitable adoption cannot be applied to an oral contract to adopt a person who was an adult at the time the oral contract was made. Thompson v. Moseley, 344 Mo. 240, 125 S.W.2d 860. The trial court properly found that

L. Craig Jackson was not the adopted daughter of C. Lee Downey.

■ It is therefore true that if Gladys Hemphill and William Crouch were cousins of the deceased, C. Lee Downey, they were proper parties plaintiff. The evidence as it relates to this is that John Downey, the father of C. Lee Downey, was really named Lake and that he had changed his name to Downey. To support Gladys Hemphill's claim of relationship, she introduced in evidence the death certificate of John Downey which gave the name of his parents as Louis H. Lake and Rebecca Lake. She testified that John Downey had a brother who never changed his name. He was William Henry Lake and she was William Henry Lake's daughter. Three witnesses testified that John Downey had referred to William Henry Lake as his brother. Pictures of tombstones were offered to support the claim that John Downey's real name was John Lake. The testimony of the witnesses was not contradicted on any material matter and if true it established as a fact that Gladys Hemphill was a cousin of C. Lee Downey, deceased. The trial judge who heard and saw the witnesses believed them and found that the plaintiff was so related to C. Lee Downey. This was amply supported by the evidence and the court did not err in so holding, as respondent here contends.

As to the finding of the court that intervenor, Crouch, was a cousin of C. Lee Downey, this rests upon the testimony of a Mrs. Miller, who also was a cousin of Downey on his mother's side. She stated that William Crouch was a son of C. Lee Downey's maternal aunt. The relationship of the aunt was supported by the Bromley family Bible. Bromley was the maiden name of C. Lee Downey's mother. There is no evidence in contradiction of this and the claim of Crouch that he is a cousin of C. Lee Downey is supported by the evidence. The trial court therefor correctly held that the plaintiff and the intervenor were proper parties to this action.

As stated, the issue sought to be determined relates to the title to the preferred stock of the C. L. Downey Company. The appellants here contend that L. Craig Jackson held the stock in common ownership with C. Lee Downey and that she is therefore entitled to but one half of the 1440 shares and that the other half should be inventoried as an asset of Downey's estate. Mrs. Jackson conversely contends that she and Downey held the shares by the entirety and that she as survivor owns them all.

The evidence as it relates to this is that C. Lee Downey was born in 1871. His birthplace was in Eastern Illinois and he was educated there and graduated from the University of Illinois. He moved to Cincinnati, Ohio, and there invented coin counting and coin packaging machines. He started a factory in Cincinnati and in 1917 incorporated his business under the name of C. L. Downey Company. He experienced some domestic difficulty which resulted in his wife leaving him and going to California. She made the property settlement mentioned above and it was after this that he told Mrs. Jackson that he needed her help and that if she would come into the Downey corporation and help him in the business she could have his interest in the company upon his death. Later Mrs. L. Craig Jackson did give up the business which she had been profitably following and did go into the Downey Company. She worked closely with Mr. Downey and was employed continuously in work for the corporation until Downey's death. She then replaced him as president of the C. L. Downey Company.

In 1941, C. L. Downey Company moved its principal place of business to Hannibal, Missouri. Both Downey and Mrs. Jackson took up their residence there. The company was duly licensed to do business in Missouri and it maintained only a warehouse in Cincinnati, Ohio. The common stock of the company was owned by Downey and Mrs. Jackson. This stock, by contract, was sold to the Johnson Fare Box Company a Delaware corporation, in 1946,

and there was issued to "C. Lee Downey or L. Craig Jackson" 1500 shares of preferred stock. The contract provided that so long as C. Lee Downey or L. Craig Jackson either "jointly or individually" owned not less than 750 shares of preferred stock the Johnson Fare Box Company would vote the common stock for a majority of· directors nominated jointly by L. Craig Jackson and C. Lee Downey or the "survivor or survivors of them". The contract was later involved in litigation and is fully discussed in Johnson Fare Box Co. v. C. L. Downey Co., 364 Mo. 521, 263 S.W.2d 413. There is no dispute of the fact that up to the time of Downey's death he and Mrs. Jackson owned the preferred stock and that by reason of this and the contract relating to the common stock they controlled the company.

There was evidence that Mr. Downey told several prominent men of Hannibal that the business would be Mrs. Jackson's upon his death. The defendant also offered the testimony of Charles E. Rendlen, a learned member of the Hannibal Bar, who testified that he had suggested the necessity of a will to Mr. Downey on one occasion and Downey replied: "I do not need a will. I have all my affairs fixed so that Mrs. Jackson will get what I have upon my death and it will be hers and is hers."

Upon the foregoing evidence the trial court held that the law of Ohio determined the interest that Downey and Mrs. Jackson had in the stock. It further held that under the Ohio law Mrs. Jackson owned the stock upon the death of Downey.

The appellants state that the court properly held that the Ohio law was controlling, but contend that the court erred in holding that the Ohio law favored Mrs. Jackson's claim. The respondent urges that the court erred in holding that the Ohio law controls, but states that if it does the court properly applied it. We are therefore obliged to first consider whether the law of Missouri or the law of Ohio shall be relied upon to fix the present ownership of the stock.

■ Respondent urges that since the corporation had its principal place of business in Missouri and since the stock certificates were actually issued here the law of Missouri should apply. It is asserted that Section 351.575 RSMo 1949, V.A.M.S., requires that a corporation licensed to do business in Missouri shall be treated as a Missouri corporation. This, however, extends the meaning of the section beyond its intent for it merely states that a foreign corporation shall enjoy the same rights and privileges as a domestic corporation and shall be subject to the same duties and restrictions. It will be readily seen that there is nothing in this section regulating the internal operation of a corporation and it does not apply to the stock permitted to be issued by the state where the corporation is chartered. State ex rel. Standard Tank Car Co. v. Sullivan, 282 Mo. 261, 221 S.W. 728. We are cited by respondent to a number of cases which relate to the transfer of stock certificates between parties wherein the law of the state where the transfer took place is applied to determine who owns the certificates, but we need not extend this opinion by considering these cases, for the stock here under consideration was an original issue which was never negotiated. The law as it may relate to transfer of stock certificates consequently is not applicable.

■ The laws of the sovereign, which created the corporation, fixed its powers and duties, and permitted it to issue and sell stock of various classifications, must be looked to in determining who owns the untransferred stock issued by the permission granted. The reason for this is that the question of who are stockholders is a matter of the internal management of the corporation which is governed by the law of its domicile. Beale, Conflict of Laws, § 192.5; Black v. J. W. Zacharie & Co., 3 How. 483, 44 U.S. 483, loc. cit. 511, 11 L.Ed. 690; United Cigarette Mach. Co. v. Canadian Pac. Ry. Co., 2 Cir., 12 F.2d 634; Morson v. Second Nat. Bank of Boston, 306 Mass. 588, 29 N.E.2d 19, 131 A.L.R.

189. Without discussion of the point before us, the Supreme Court of Missouri on two occasions applied the law of the corporate domicile; in one case to determine the liability of a stockholder, Flint v. Sebastian, 317 Mo. 1344, 300 S.W. 798, and in Glenn v. Hunt, 120 Mo. 330, 25 S.W. 181, the law of the domicile of the corporation was applied to determine whether or not a party to the action was a stockholder. We therefore appear to be in accord with the generally accepted rule that the law of the state granting the corporate charter shall determine who are stockholders. In view of this, it must be held that the trial court properly ruled that the issues presented were governed by the laws of Ohio.

■ It is the contention of the appellants that the statutes of Ohio in force at the time the shares of stock were issued provided an exclusive method by which shares of corporate stock may be issued when two or more persons desire to hold such stock as joint owners with ownership of all of the shares in the survivor. The statute upon which the plaintiffs rely is Section 8623–30, Page's Ohio General Code 1946, which provides:

"A joint estate with the incidents of a joint estate as at common law (including right of survivorship) may be created in shares by issuing the same to two or more persons as joint tenants, provided that the words 'as joint tenants' are written after the names of such persons on the certificate".

The use of the words "may be" created in the quoted section is said to mean "provided that" or "if and only if". The appellants reach this conclusion upon the theory that in Ohio there was no common law joint estate in personal property with the incident of survivorship and they state that the statute was enacted to provide a sole and exclusive exception. We are cited to In re Hutchison's Estate, 120 Ohio

St. 542, 166 N.E. 687, 690, where the court stated:

"It may be broadly stated that title to either real or personal property by technical joint tenancy is not recognized in this state; that is to say, joint tenancy, with the necessary attributes of unity of interest, title, time, and possession, and the equally necessary concomitant of jus accrescendi, is no longer recognized, and wherever the expression 'joint tenancy' is found, without any effort to expressly provide for survivorship, it is uniformly construed as a tenancy in common."

This case involved corporate stocks with an express provision for the title in the survivor, and the court held that the entire estate in the stock passed to the survivor, holding that although the joint tenancy was not recognized the parties could contract for a joint ownership with the right of survivorship. A like conclusion was reached in Cleveland Trust Co. v. Scobie, 114 Ohio St. 241, 151 N.E. 373, 48 A.L.R. 182, in respect to a bank account which was entered under the name of one or another "at death of either payable to survivor". Since it thus appears by these and subsequent cases that parties may contract for the ownership of property so that they may hold it with the incidents of a joint tenancy the statute was not as appellants contend the only and exclusive way of creating such an estate in corporate stock.

■■ Looking to the words used on the certificates, "C. Lee Downey or L. Craig Jackson", it must be held that under the Ohio law these words, standing alone, do not create an estate in the stock to the survivor. As stated by the learned trial judge in his findings of fact and conclusions of law: "The word 'or' is disjunctive in its very nature, and is incompatible with tenancy in common because it infers one or the other, but not both. So, the court cannot determine the intentions of the parties from their words alone, and must resolve the ambiguity by looking to

other evidence of their intentions." This statement follows the case of In re Fulk's Estate, 136 Ohio St. 233, 24 N.E.2d 1020, 1022, wherein ownership of a deposit in a building and loan association was determined. The deposit was made in the name of John Fulk or Ida Fulk. The court stated that the word "or" did not furnish it with the full intention of the parties as it was vague and ambiguous. Continuing, the court said:

"In the construction of a contract words are usually to be limited to their ordinary everyday meaning but if the parties making the contract agree that the words used shall have some additional or other meaning, the same may be shown by parol testimony."

It then applied the rule stated to the account there under consideration and upon the testimony of a cashier of the loan association to the effect that he told the depositor that the words used would vest the savings in the survivor, the court held that the survivor did succeed to the entire interest.

The evidence in the case at hand offers clear and convincing proof that Downey agreed with Mrs. Jackson that if she would leave her position and enter his business it would be hers upon his death. The certificates were issued with this in mind as the corporation was under Downey and Mrs. Jackson's complete control and he repeatedly asserted that he had fixed his affairs so that the business would be Mrs. Jackson's upon his death. This was evidence of what he and Mrs. Jackson intended the certificates to mean at the time they issued them. It was evidence that the certificates were intended to consummate the agreement of the parties. By authority of the Fulk's Estate case, supra, such evidence made the meaning of the certificates clear and created a survivor interest in the stock. Mrs. Jackson became the owner of the stock upon the death of Downey, and the trial court properly so held.

For the reasons stated, it is the recommendation of the Commissioner that the judgment be affirmed.

PER CURIAM.

The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The judgment of the Hannibal Court of Common Pleas is accordingly affirmed.

RUDDY, P. J., and MATTHES and ANDERSON, JJ., concur.